# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 97-50818

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHROMALLOY AMERICAN CORPORATION,
formerly doing business as WOOLLEY TOOL &
MANUFACTURING

and
SEQUA CORPORATION,

Defendants-Appellants.

Appeal from the United States District Court
for the Western District of Texas

November 4, 1998

Before DUHÉ, BENAVIDES, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

The Environmental Protection Agency ("EPA") brought this action under the Comprehensive

Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") to secure

reimbursement for all costs incurred in overseeing Chromalloy American Corporation and Sequa

Corporation's (collectively, "Sequa") clean up of an environmental contamination. Sequa appeals

the district court's grant of summary judgment and order requiring Sequa to compensate the EPA

for its administrative expenses incurred pursuant to a Consent Decree between the parties. Our review of the law, briefs and record on appeal leads us to AFFIRM the judgment of the district court.

I.

Factual Background

The facts underlying Sequa's strained relationship with the EPA are not new to this court. See Matter of Bell Petroleum Services, Inc., 3 F.3d 889, 892-894 (5th Cir. 1993). The court will not revisit the entire history here; however, the court herein highlights those facts which are most pertinent to the case at bar.

After the EPA discovered chromium contamination at a Sequa manufacturing facility near Odessa, Texas in 1981, the EPA conducted a remedial investigation and feasibility study and invited public comment. In 1988, upon completion of its review, the EPA issued a Record of Decision ("ROD") selecting a remedy which included the extraction of chromium-contaminated groundwater, electrochemical treatment, and the return of the treated water to the aquifer that flows under the facility. Soon thereafter, Sequa and the EPA engaged in negotiations designed to produce a consent decree under which Sequa would treat the contaminated water.

In 1991, Sequa and the United States reached an agreement and entered into a Consent Decree. This Consent Decree required, *inter alia*, Sequa to design, construct and implement a system of pumping and treating impacted ground water to reduce chromium to appropriate levels. Sequa also agreed to reimburse the EPA for its oversight costs. These costs include expenses related to the EPA's review of reports, submittals, inspection of remedial work and verification of performance in accord with the Consent Decree. Pursuant to an interagency agreement ("IAG"), the Bureau of Reclamation ("BOR"), a division of the U.S. Department of the Interior, has assisted the EPA in

2

overseeing Sequa's clean up efforts. For over five years, Sequa has complied with the terms and conditions of the Consent Decree.

II.

Proceedings Below

In 1996, the EPA made demand on Sequa to reimburse it in the amount of $470,710.42 in oversight costs for the period of January 1, 1992 through December 31, 1994. Sequa contested the amount and negotiations ensued. After their discussions proved unsuccessful, Sequa filed a "Petition for Dispute Resolution" with the district court. Therein, Sequa contested its obligation to pay costs which were not recoverable under CERCLA and deemed the EPA's invoice of expenses outside the "costs of response" contemplated by CERCLA. Sequa challenged the validity of the IAG under the Economy Act, 15 U.S.C. § 1535. Sequa further propounded that it was under no obligation to pay indirect costs. In its proposed resolution, Sequa requested an opportunity to conduct limited discovery and have its accountant review all costs. Sequa further sought an opportunity to file pleadings on the interpretation and enforceability of the Consent Decree and permission to pay the disputed amount plus interest into the Registry of the Court.

By order entered July 24, 1997, the district court held that the EPA did not exceed its authority when it entered into the Consent Decree and required Sequa to pay for oversight costs associated with clean-up of the site. The district court rejected Sequa's reliance on the Economy Act of 1932 to argue that the EPA must show that Sequa is obligated to reimburse BOR for its oversight activities associated with Sequa's clean-up of the site. The district court further found that as an agency of the United States, BOR expenses are those of the United States. The district court directed Sequa to compensate the EPA in the amount of $470,710.42.

3

The district court rejected Sequa's subsequent "Motion and Brief for a New Trial, to Alter or Amend Order, or for Entry of Findings and Conclusions of Law." In its order addressing the same, the district court clarified that implicit in its previous order was a finding that the EPA and BOR's expenses were reasonable and necessary. The district court foreclosed further remedial review and directed the parties to address any further concerns to this court.

III.

Statutory Background

CERCLA, as amended by the Superfund Amendments and Reauthorization Act of 1986, facilitates prompt clean up of hazardous sites by establishing a response and financing mechanism to control problems endemic to hazardous waste disposal sites. See H. R. Rep. No. 1016(I), 96th Cong. 2d Sess. 22 (1980) reprinted in 1980 Code Cong. & Admin. News 6119; Matter of Bell Petroleum, 3 F.3d at 894. CERCLA § 107, 42 U.S.C. § 9607 specifically provides for the recovery of costs from all persons responsible for the release of hazardous substances. Thus, those responsible for contamination bear the ultimate responsibility of paying for its cleanup. See United States v. R.W. Meyer, Inc, 889 F.2d 1497, 1500 (6th Cir. 1989).

Different types of costs are associated with clean up. CERCLA expressly permits the government to recover "all costs of removal and remedial action" and "any other necessary costs of response incurred by any other persons." CERCLA § 107(a)(4), 42 U.S.C. § 9607(a)(4). The government's oversight costs in a responsible party clean-up are response costs under CERCLA. See U.S. v. Lowe, 118 F.3d 399, 404 (5th Cir. 1997). However, CERCLA requires these "necessary costs of response" be consistent with the national contingency plan." CERCLA § 107(a)(4), 42 U.S.C. § 9607(a)(4).

4

The National Contingency Plan ("NCP"), 40 C.F.R. Part 300, promulgated by the EPA as a regulation pursuant to CERCLA § 105, 42 U.S.C. § 9605, provides an "organizational structure and procedures for preparing for and responding to the discharge of hazardous substances, pollutants and contaminants." 40 C.F.R. § 300.1. The NCP articulates "methods for investigating the environmental and health problems resulting from a release or threatened release and criteria for determining the appropriate extent of response activities." Matter of Bell Petroleum, 3 F.3d at 894.

The Economy Act of 1932, 31 U.S.C. § 1535(a) provides:

> [T]he head of an agency or major organizational unit within an agency may place an order with a major organizational unit within the same agency or another agency for goods or services if:
> (1) amounts are available;
> (2) the head of the ordering agency or unit decides the order is in the best interest of the United states government;
> (3) the agency or unit to fill the order is able to provide or get by contract the ordered goods or services; and
> (4) the head of the agency decides ordered goods or services cannot be provided by contact as conveniently or cheaply by a commercial enterprise.

31 U.S.C. § 1535(a). Under the Economy Act, government agencies should seek the most cost efficient means of production. In practice, government agencies should not call upon the private sector to perform services other government agencies can perform as expeditiously and for less money. See H.R. Rep. No. 1126, 72d Cong., 1st Sess. 1, 16 (1932). The Economy Act applies when more specific statutory authority does not exist. Cf. Techniarts Engineering v. United States, 51 F.3d 301 (D.C.Cir. 1994)(declining to apply Economy Act where TV Marti Act offered specific and applicable requirements).

IV.

Analysis

5

The primary issue in this case centers on whether the district court erred in requiring appellants to reimburse the EPA's oversight costs for cleaning up groundwater in a contaminated area. Within this primary issue, appellants argue its concerns that (1) the district court incorrectly interpreted the consent decree as requiring Sequa to reimburse the EPA for certain oversight costs; (2) the district court erred in finding the EPA's oversight costs were reasonable and necessary; (3) the absence of specific statutory authorization for oversight costs required the district court to invalidate or delete that portion of the consent decree requiring payment for such costs.[1] The court considers the merits of each argument in turn.

A.

Interpretation of Consent Decree

A consent decree is akin to a contract yet also functions as an enforceable judicial order. See generally, Baylor v. United States Dep't of Housing and Urban Development, 913 F.2d 223, 225 (5th Cir. 1990)("A consent decree is a judicial order[.]") General principles of contract interpretation govern the interpretation of a consent decree. See Lelsz v. Kavanaugh, 824 F.2d 372, 373 (5th Cir. 1987); see also, Browning v. Navarro, 743 F.2d 1069, 1080 (5th Cir. 1984). Thus, consent decrees are to be construed only by reference to the 'four corners' of the order itself. Robinson v. Vollert, 602 F.2d 87, 92 (5th Cir. 1979). Sequa challenges the district court's interpretation of the consent decree. The district court found that "by the very terms of the Consent Decree," Sequa is responsible to the United States for its oversight costs. R. 811. Interpretation of unambiguous contract is a question of law that this court reviews de novo. Clardy Manufacturing Co. v. Marine Midland

_____

[1]Sequa acknowledged at oral argument that this identical contention was expressly rejected by the court in Lowe, *supra.*

Business Loans, Inc., 88 F.3d 347, 352 (5th Cir. 1996)(citing <u>Guidry v. Halliburton Geophysical Servs., Inc.</u> , 976 F.2d 938, 940 (5th Cir. 1992)).

1. Plain Language of Decree

The parties do not dispute that the express terms of the consent decree obligates Sequa to fully reimburse the EPA for its oversight costs. Sequa, however, invites this court to move beyond the plain meaning of the consent decree and the literal meaning of the words to adopt alternative rules of construction. Specifically, Sequa argues that this court should assume a reasonable, lawful and effective meaning of the words "fully reimburse" and "oversight costs" as opposed to any manner which would put it wholly at the mercy of the EPA. Sequa further argues that its contract with the government cannot diminish its rights prescribed by a statute or regulation in effect and made part of the contract.

The court must decline Sequa's invitation. This court has previously held that when a contract is expressed in unambiguous language, its terms will be given their plain meaning and enforced as written. See Certain Underwriters at Lloyd' s of London v. C.A. Turner Constr. Co., 112 F.3d 184, 186 (5th Cir. 1997). Our review of the consent decree reveals three provisions in which Sequa expressly assumed responsibility for oversight costs. Again, the parties do not dispute this matter. Sequa's eleventh hour attempt to read into the consent decree provisions not expressed therein is unacceptable. "The entry of a consent decree necessarily implies that the litigants have assented to all of its significant provisions." <u>United States v. City of Miami</u>, 664 F.2d 435, 440 (5th Cir. 1981). As the appellee notes, Sequa's real complaint rests in Sequa's failure to contemplate the expenses associated with oversight costs and its failure to negotiate limits to its obligation to pay those costs.

7

See e.g., B.F.Goodrich v. Betkoski, 99 F.3d 505, 512 (2d Cir. 1996)(recognizing agreement between parties, pursuant to a consent decree, to reimburse the government for future oversight costs in excess of a certain amount); U.S. v. Pepper's Steel and Alloys, Inc., 658 F. Supp. 1160, 1165 (S.D.Fla. 1987)(settling party agreed to reimburse oversight costs up to a certain amount).

2. The Economy Act of 1932

Sequa further challenges the district court's failure to find that the oversight costs were incurred in violation of the Economy Act of 1932; consequently, they are not recoverable. According to Sequa, the EPA failed to follow the Economy Act's four part provisions when it entered an interagency agreement with the BOR. Specifically, Sequa notes that the EPA failed to (1) solicit bids from the private sector to determine whether the same service could be provided at a lower price; and (2) comply with its own policies requiring it to prepare decision memorandum evaluating why a commercial service should not be used and providing a rationale for selecting the proposed agency. Sequa further highlights provisions within the interagency agreement identifying the Economy Act as the statutory authority for the transfer of funds and for the projected activities. An attachment to the interagency agreement certified that the agreement was consistent with the Economy Act.

Determining the relationship between CERCLA and the Economy Act is an issue of first impression for this court; therefore, as an initial matter we must determine whether the Economy Act applies. CERCLA clearly states that "notwithstanding any other provision of law," a private party will reimburse the United States for all costs incurred. 42 U.S.C. § 9607(a)(4)(A). On its face, this language indicates that CERCLA operates exclusive of the Economy Act. However, this court has rejected identical provisions in other acts when ambiguity belies the effect of the language. See United States v. Dixie Carriers, Inc., 627 F.2d 736, 739 (5th Cir. 1980)(finding that the phrase

8

supports at least two conflicting interpretations and cannot resolve the controversy); <u>Steuart Transportation Co. v. Allied Towing Corp.</u>, 596 F.2d 609, 615 (same). However, the absence of ambiguity with regard to CERCLA makes the case against applying the Economy Act more compelling.

Unlike the relevant statute in <u>Dixie Carriers</u> and <u>Steuart</u>, however, CERCLA's "notwithstanding" clause is not ambiguous. The Court found ambiguity in <u>Dixie Carriers</u> and <u>Steuart</u>, because the phrase "any other provisions of law" conceivably referenced laws imposing liability and laws limiting liability. The same may not be said in this case because CERCLA establishes "a federal cause of action in strict liability to enable the administrator to pursue rapid recovery of the costs incurred[.]" H.R. Rep. 96-1016(I), 96th Cong., 2d Sess. 22 (1980). Moreover, while CERLCA enumerates defenses to imposing liability; it is silent with regard to limitations on the amount of liability. Congress acts intentionally and purposely in the disparate inclusion or exclusion of particular language. <u>See</u> <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983). Here, Congress has yet to amend CERCLA to limit the amount of liability for costs, including oversight costs. Consequently, the court finds the instant case to be easily distinguished from, <u>Dixie Carriers</u> and <u>Steuart</u>. The "notwithstanding" clause in this case is explicit and must be given effect. <u>See, e.g.,</u> <u>Town of Munster, Ind. v. Sherwin-Williams Co.</u>, 27 F.3d 1268, 1271 (7th Cir. 1994). The EPA's failure to follow the Economy Act does not preclude imposition of oversight costs to Sequa.[2]

---

[2]As the district court found, the Consent Decree requires Sequa to reimburse the United States for its monitoring activities. Like the EPA, the BOR is an agency of the United States and the interagency agreement, regardless of whether it technically complies with the Economy Act, does not affect the right of the United States to recoup oversight expenditures. <u>See</u> R. 813-14. To hold otherwise would undermine the purpose of CERCLA and overemphasize the relevance of the Economy Act in securing reimbursement for the government's cleanup related expenses.

9

3. Interagency Agreement

Sequa offers a basis for what it considers restrictions on the ability of the EPA to spend money, obtain goods or services from private parties, and hire other governmental agencies. While Sequa provides a number of cites to support its argument, its reference to the EPA's own policies requiring it to prepare a decision memorandum before entering into an interagency agreement is most compelling. Interagency Agreement Policy and Procedures Compendium ("Compendium"), R. 788, 795-96. The EPA cites the Economy Act as "Statutory Authority for Both Transfer of Funds and Project Activities" in its IAG with the BOR. R. 281. Sequa further calls our attention to Attachment B to the IAG requiring the BOR to certify that the agreement is consistent with the Economy Act.

Despite the EPA's contention that the aforementioned citations to the Economy Act are "erroneous or superfluous," there is little doubt that the EPA looked to the Economy Act as a basis for its IAG. However, defects in the agreement between the EPA and the BOR do not negate Sequa's obligation to pay because that obligation arises under the express terms of the Consent Decree and CERCLA. Additionally, we are not satisfied that the EPA's apparent failure to comply with its internal procedures or policies creates cognizable rights in Sequa. Finally, it is not disputed that CERCLA requires the costs be consistent with the National Contingency Plan. Sequa does not argue that the recoverability of the oversight costs are inconsistent with the NCP. Nothing in the NCP requires the EPA to conform to the Economy Act or otherwise address IAG certification of indirect costs. Accordingly, we find that any defects in the IAG does not dissolve Sequa's obligation to pay the costs of oversight.

4. Indirect Costs

The Court must reject Sequa's challenge to payment of indirect costs. Our focus does not rest on the nuances of the interagency agreement but on the more narrow issues of whether the costs were incurred in connection with the site and whether those costs are consistent with the NCP. The indirect costs were incurred in connection with the site and Sequa has failed to show any inconsistency with the NCP.[3] Moreover, Sequa has not asserted any defense cognizable under CERCLA for payment of the costs. Instead, Sequa relies on the substance of the IAG which this Court has already found affords no rights to Sequa.

B.

Standard for Assessing Oversight Costs

1. Reasonable and Necessary

We apply the clearly erroneous standard of review to the district court's determination that the oversight costs were reasonable and necessary. Although the district court's opinion in this regard is brief, we agree with the EPA and cannot find the district court's determination is clearly erroneous.

Sequa argues that the district court properly decided that the oversight costs had to be reasonable and necessary; however, Sequa contends the district court erred in finding the oversight costs were reasonable and necessary.[4] According to Sequa, there was no evidence to support the

---

[3]The burden of proving inconsistency with the NCP rests with the responsible party. See, B.F. Goodrich, 99 F.3d at 528; U.S. v. Hardage, 982 F.2d 1436, 1442 (10th Cir. 1992); R.W.Meyer, Inc., 889 F.2d at 1508 (6th Cir. 1989). Sequa must show either that the EPA violated a provision of the NCP or that it acted aribitrarily and capriciously. See 42 U.S.C. § 9613(j)(2); see also, Matter of Bell Petroleum, 3 F.3d at 907, adopting the reasoning of the Tenth Circuit in Hardage.

[4] This court has left open the question of whether unreasonable, unnecessary, or excessive costs can be recovered. Matter of Bell Petroleum, 3 F.3d at 907 n. 26.

11

finding, especially given its evidence, an affidavit of its "expert" Guy Swinford indicating that a reasonable charge for oversight is 5-15% of the remediation costs. Sequa also argues that the district court did not make sufficient findings of fact regarding reasonableness and necessity of oversight costs. Sequa further propounds that § 9607(a)(4)(A) limits the government to recovering necessary costs.

We reject Sequa's arguments. Our review leads us to conclude that the district court had an adequate basis upon which to find the costs reasonable and necessary. The EPA submitted detailed cost summaries supporting its oversight expenses. Courts have held such documentation to be sufficient to establish a prima facie case that the government is entitled to its response costs. Hardage, 982 F.2d at 1442-43. Moreover, although Sequa's expert supported assertions that less oversight was necessary his testimony does not overcome the deference accorded the EPA's expertise. See generally, Petrou Fisheries, Inc. v. I.C.C., 727 F.2d 542, 545 (5th Cir. 1984)(discussing the deference accorded an agency when reviewing actions that implicate its area of expertise). Additionally, as long as the government's choice of response is consistent with the NCP, costs are presumed to be recoverable. See United States v. Northeastern Pharmaceutical & Chemical Co. ("NEPACCO"), 810 F.2d 726, 748 (8th Cir. 1986). Sequa has not shown, to the satisfaction of this court, any inconsistency with the NCP.

Finally, we cannot find that the district court violated Rule 52(a) of the Fed. R. Civ. P. since the district court issued two orders. One order presented findings of fact while the other presented conclusions of law. Although the district court asked Sequa to address whether the EPA's position was arbitrary and capricious, Sequa failed to do so. Instead Sequa offered general allegations in

12

support of the reasonable and necessary standard. Consequently, the district court had no basis upon which to issue more detailed findings of fact.

2. Arbitrary and Capricious

The Consent Decree provides,

If the United States performs portions of the Remedial Action because of Settlors' failure to comply with their obligation under this Consent Decree, Settlors shall reimburse the United States for the costs of doing such work within 60 days of receipt of demand for payment of such costs, except as to those costs which the Settlors can prove were incurred in an *arbitrary and capricious* manner and are costs not inconsistent with the NCP.

Consent Decree, R. 36 (emphasis added). The parties do not dispute that this language places a burden on Sequa to show EPA's position with respect to oversight costs was "arbitrary and capricious." However, the Consent Decree does not define what the arbitrary and capricious standard is.[5] The absence of a fixed meaning exacerbates our review of arbitrary and capricious in this context.

While the meaning of "arbitrary" or "arbitrary and capricious" depends on the context, it does not mean that the term is otherwise ambiguous when it is not defined by law or by the parties to a consent decree. If we were to adopt Sequa's "inherently ambiguous" argument, courts would not

---

[5]As Sequa notes, the "arbitrary" or "arbitrary and capricious" standard involves different determining principles based upon the type of action being reviewed. Courts look for a rational relationship to a legitimate government purpose in a substantive due process challenge. Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 125-26 (1978). When considering an award of punitive damages, a finding is "arbitrary" if excessive when measured against: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio between the plaintiff's compensatory damages and the amount of punitive damages; and (3) the difference between the punitive damages awarded and the similar criminal sanctions that could be imposed for comparable misconduct. BMW of North America, Inc. v. Gore, 116 S.Ct. 1589 (1996). A determination of arbitrary and capricious in the administrative rule-making context requires courts to examine whether the administrative agency considered the factors Congress intended to be reviewed and whether there is a rational connection between those concerns and the decision made. Motor Vehicles Mfrs. Ass. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 42-43 (1983).

13

have been able to define, let alone apply, the terms in the substantive due process context, the punitive damages context or the agency rule-making context. In Matter of Bell Petroleum, we employed the "arbitrary and capricious" standard when we held that a defendant must show that the EPA acted arbitrarily and capriciously in choosing a particular response. See Matter of Bell, 3 F.3d at 907 (adopting Tenth Circuit's decision in Hardage, 982 F.2d at 1442). Here, the response at issue pertains to oversight costs. Since the parties adopted the "arbitrary and capricious" phrase in their Consent Decree, we first look to the plain meaning of the words.

Webster's Third New International Dictionary defines "arbitrary" as "based on random or convenient selection or choice rather than on reason or nature." The adjective "capricious" is defined as "not guided by steady judgment, intent or purpose; lacking a standard or norm; marked by variation or irregularity; lacking a predictable pattern or law." As applied to the EPA's demand for reimbursement of oversight costs, the meaning of these terms is not ambiguous. Sequa may have endeavored to prove that the EPA's costs were "arbitrary and capricious" by: (1) highlighting the randomness with which the EPA tabulated costs; (2) exposing the absence or lack of substantial evidence to support the EPA's tabulation of costs; and (3) showing the unreasonableness of the oversight costs by juxtaposing the amount the EPA is demanding and payment of oversight costs in similar contexts.

The district court expressly ordered both Sequa and the EPA to file final briefs focusing on "whether the EPA's position with respect to the...response costs...is arbitrary and capricious." R. 479. Neither the Consent Decree nor the district court's order defines arbitrary and capricious and despite its duty to elaborate on the standard, Sequa failed to do so. Sequa similarly did not show any inconsistency with the NCP. Furthermores, Sequa never argued that the costs were arbitrary and

14

capricious but argued that the EPA may only recover those costs which are reasonable and necessary. The district court implicitly rejected Sequa's argument by crediting the detailed documents bearing upon the EPA's costs.  See R. 328-368.

In conclusion, our review of the record reveals ample support for the district court's judgment.  When viewed under either standard, we are satisfied that the district court made the correct decision.

V.

Conclusion

For the reasons stated herein, we AFFIRM the judgment of the district court.