# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-2430

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Southern District of Iowa. |
| Dico, Inc., | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted:  April 10, 2001

Filed:  September 19, 2001

_____

Before BOWMAN and FAGG, Circuit Judges, and PIERSOL,[1] District Judge.

_____

BOWMAN, Circuit Judge.

The United States sued Dico, Inc., pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601-9675 (1994 & Supp. IV 1998), to recover response costs incurred for the

_____

[1]The Honorable Lawrence L. Piersol, Chief Judge, United States District Court for the District of South Dakota, sitting by designation.

cleanup of groundwater contaminated by trichloroethylene (TCE)[2] and other chlorinated volatile organic compounds (VOCs). The District Court[3] held a bench trial and found Dico liable for response costs incurred in connection with the groundwater contamination. The court also granted summary judgment to the United States on the amount of cleanup costs it was entitled to recover from Dico. Dico appeals both as to liability and damages. We affirm.

## I.

This litigation returns to this Court for the third time. The case arises from the EPA's determination, made in the mid-1970s, that the Des Moines public water supply had been contaminated by TCE and other chlorinated VOCs. Dico's property sits within the boundaries of the Des Moines TCE Site (the Site), the land area identified by the EPA as the source of the contamination. Dico and other businesses located within the Site had for many years used TCE for degreasing and other industrial applications. The EPA designated Dico as a potentially responsible party under CERCLA and issued a cleanup order to Dico. Dico complied, thereby incurring response costs. Moreover, the EPA itself incurred costs in connection with the cleanup of the Site. For a detailed history and factual background of the prior litigation, see Dico I, 35 F.3d at 349-50 (reversing grant of summary judgment to the EPA in Dico's suit against the EPA seeking reimbursement for response costs it incurred in complying with the EPA's cleanup order), and United States v. Dico, Inc., 136 F.3d 572, 574-75 (8th Cir. 1998) (Dico II) (reversing grant of summary judgment to the EPA in the EPA's cleanup-cost recovery action against Dico).

---

[2]"TCE is a suspected human carcinogen and also has been linked to neurological damage, and, at high exposure, death." Dico, Inc. v. Diamond, 35 F.3d 348, 349 n.2 (8th Cir. 1994) (Dico I).

[3]The Honorable Ronald E. Longstaff, United States District Judge for the Southern District of Iowa.

Following our remand in Dico II, the District Court heard the EPA's suit against Dico at a bench trial. The EPA's theory of the case was that Dico had released TCE on its property via numerous sources and activities: leaks from vapor degreasers that used TCE to degrease metal parts manufactured by Dico; spreading TCE-laden sludge as a dust suppressant on the ground around Dico's buildings; dumping TCE sludge directly onto the ground; storing TCE sludge in drums left exposed to the weather; leaks from railcars, drums, and storage tanks used in Dico's chemical repackaging and supply business; and cleaning of TCE storage drums at Dico's facility. The EPA further contended that the TCE released by Dico migrated through the soil into the groundwater below Dico's property.

In defense, Dico attempted to identify potential alternative sources for the groundwater contamination. Dico argued that all of the groundwater contamination the EPA attributed to its activities actually originated with polluters located to the north of its property. Dico contended that contamination found a mile north of Dico, near the Martin Luther King Expressway (MLKE area), migrated with groundwater flowing south into the aquifer below Dico's property. Dico also attacked the government's case by arguing that even if Dico released TCE, none of the TCE could have migrated far enough down through the soil to reach the groundwater.

The District Court found Dico liable for the costs incurred by the EPA in cleaning up the groundwater at the Site, but delayed its decision on the amount of the cleanup costs to be awarded to the EPA pending a hearing on the EPA's motion for summary judgment on that question. After a hearing, the District Court granted summary judgment to the EPA, awarding it $4,129,426.67 in cleanup costs. Dico appeals both the liability and the award portions of the judgment entered by the District Court.

II.

Dico challenges the District Court's liability determination on numerous grounds. We first address Dico's objections to evidentiary rulings on the admission of expert testimony and of deposition testimony offered by the government after the close of both parties' cases-in-chief.

A.

Dico argues that the District Court erred in refusing to exclude the testimony of John Robertson, the government's expert hydrogeologist, because "his methodology was unreliable." Appellant's Br. at 29. We review a district court's decision to admit expert testimony under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), for an abuse of discretion. Kumho, 526 U.S. at 152; General Elec. Co. v. Joiner, 522 U.S. 136, 138-39 (1997). Admissible expert testimony must be grounded upon scientifically valid reasoning or methodology.[4] Daubert, 509 U.S. at 592-93. The court must examine both the relevance and the reliability of the proffered testimony, Blue Dane Simmental Corp. v. Am. Simmental Ass'n, 178 F.3d 1035, 1040 (8th Cir. 1999), keeping in mind that "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595.

Dico does not dispute the relevance of Robertson's testimony. Rather, Dico challenges the reliability of Robertson's testimony, urging us to reject his methodology

_____

[4]Some of the factors relevant to this inquiry include whether the theory or technique at issue can be tested, whether it has been subjected to peer review and publication, whether its rate of error is known, whether there are standards that are maintained to control the technique's operation, and whether the technique has gained acceptance within the relevant scientific community. Daubert, 509 U.S. at 593-94.

and exclude his testimony on several grounds. First, Dico argues that Robertson's analysis of the contamination found on its property is fundamentally flawed because he ignored evidence suggesting alternative sources for the contamination. Dico argues that Robertson improperly excluded from his computer model any consideration of groundwater flow onto Dico's property from the north,[5] failed to consider the Ingersoll Run as a conduit for contamination originating off of Dico's property,[6] disregarded data indicating that the amount of TCE in the Dico remediation wells increased after their activation,[7] and ignored all data regarding TCE contamination in the MLKE area.

---

[5]Dico also argues that Robertson mischaracterized the soil permeability in the north area as low because the United States Department of Agriculture (USDA) classifications of soil in this area indicated moderate permeability. Robertson testified that the USDA classifications apply only to the upper three to six feet of the soil, and thus are primarily meant for agricultural purposes. Tr. at 152. He distinguished these classes from those of the deeper soils in the area, and noted that the wells drilled there could not produce water as would wells drilled in an aquifer. Thus, he reasoned that the permeability of the soil was low compared to the surrounding areas. See Tr. at 129-30.

Moreover, Dico urges us to reject Robertson's analysis because the EPA's report on the north area stated that a permeable sand lens thirty feet thick underlaid parts of that location. See Tr. at 342. Dico's argument is unpersuasive; the report itself further states that the "sand lens does not appear to be connected hydraulically to the lowland flood plain alluvial deposits" found below the Racoon River. U.S. EPA, Remedial Investigation Report, Des Moines TCE OU NO. 3, 1-3 (June 24, 1992). The Racoon River sits between Dico and the north area, and thus the sand lens appears not to factor into groundwater flow toward Dico from the north. The District Court did not abuse its discretion in rejecting Dico's arguments on these issues.

[6]The Ingersoll Run is a drainage ditch that runs from north to south through the eastern portion of Dico's facility and terminates in a drainage pond at the south end of the property.

[7]Dico argues that this data supports its defense that the pollution that was recovered actually originated elsewhere and was sucked into the aquifer below Dico's

The record undermines Dico's characterization of Robertson's analysis. First, Dico's arguments regarding Robertson's computer model are inapposite because Robertson testified that the model did not form the basis for his conclusion regarding the origin of the contamination. Tr. at 156. Robertson used the model for a limited purpose—studying the capture zones of the remediation wells within the boundaries of Dico's property. Tr. at 157. Thus, Dico's complaints regarding the data Robertson put into the model are without consequence to the validity of his analysis of alternative sources for the contamination. Furthermore, the model itself passes scrutiny under Daubert. Known as MODFLOW, the model is sanctioned by the EPA and is considered a standard model that is acceptable and commonly used by hydrogeologists. Tr. at 306. Dico's expert hydrogeologist used the same computer model as Robertson in his evaluation of the Site. Id.

Robertson's testimony also shows that he considered each piece of data that Dico alleges he ignored. He looked at data regarding whether the Ingersoll Run was a conduit of contamination onto Dico's property. Citing the negative results of tests performed on soil borings taken close to the Run and on sediment samples from the pond at its terminus, Robertson rejected the Run as a possible source. Tr. at 73-74. Moreover, Robertson's testimony reflects that he considered the data indicating that the amount of TCE in the Dico remediation wells increased after their activation. He explained that he used the continued existence of contamination to support his conclusion that TCE in dense non-aqueous phase liquid form (DNAPL) existed in the soil beneath Dico's property. Tr. at 70-71. Similarly, Robertson did not ignore data regarding contamination in the MLKE area. Rather, he testified that he examined data in the reports on the area and considered the amounts and location of the contamination in relation to the topography between the MLKE area and Dico's facility. Tr. at 128. From his study, Robertson concluded that the clearly delineated borders of the contamination and the different chemical fingerprints of the chemicals of concern

property by the operation of the wells.

-6-

present at the MLKE area precluded that site from being the source of the TCE removed from the groundwater by the Dico remediation well system. Dico's arguments regarding the reliability of Robertson's analysis of alternative sources of contamination do not show an abuse of discretion by the District Court in admitting Robertson's testimony.

Dico argues, as a second ground for excluding Robertson's testimony, that his analysis of the migration of TCE from the soil into the groundwater at Dico's property is based on unreliable methodology. Dico claims that Robertson's "continuous line theory" and conclusion that the contaminants left a trail of DNAPL in the soil are unsupported by the record. Dico's challenge rests primarily on the argument that the number of soil samples taken was insufficient to support Roberton's conclusions. As part of its examination of the contamination on Dico's property, Dico's contractor, Eckenfelder, Inc., drilled sixty-nine deep soil borings on Dico's property, each approximately twenty-five feet deep. From each twenty-five foot boring, approximately two small samples were sent to a laboratory for analysis. Dico contends that even if every sample tested contained TCE, such a small section of each boring was examined that the results cannot reliably support the conclusion that contamination existed continuously from the surface to the groundwater.

Robertson specifically testified that he did not rely on these results to conclude that a continuous line of contamination existed; rather, he used the results as a check that bolstered a conclusion he had already reached based upon other evidence collected. Because Dico challenges Robertson's conclusion by citing evidence that he did not use to form that conclusion, Dico's challenge fails. Moreover, the sufficiency of the factual basis of Robertson's continuous line theory was open to any challenge Dico desired to mount on cross-examination, but that sufficiency was not a basis for excluding Robertson's testimony altogether. See Hose v. Chicago N.W. Transp. Co., 70 F.3d 968, 974 (8th Cir. 1995) (stating that sufficiency of factual basis of expert testimony goes to credibility, not admissibility, unless expert's opinion "is 'so

fundamentally unsupported that it can offer no assistance to the jury'" (quoting Loudermill v. Dow Chem. Co., 863 F.2d 566, 570 (8th Cir. 1988))). Robertson cited several sources of evidence for his opinion: the organic vapor analyzer readings indicating the presence of chlorinated VOCs in the soil, the composition of the chemicals present in the soil, and the long-term presence of contamination despite the implementation of the remediation system. The District Court did not abuse its discretion in concluding that Robertson offered sufficient factual support for his opinion to withstand Dico's challenge to its admissibility.

As to Dico's attack upon Robertson's conclusions regarding the presence of DNAPL in the soil at the Dico facility, Robertson postulated that the existence of DNAPL in the soil accounts for the continued recovery of TCE by the remediation wells on Dico's property, in contrast to the defense theory that the remediation wells sucked contaminated groundwater from the MLKE area into the aquifer below Dico's property. Robertson testified that Eckenfelder based its conclusion that DNAPL was not present in the soil on a solubility threshold that was ten times greater than the standard accepted in the field. Several of the measurements of TCE taken by Eckenfelder for its report met the currently accepted standard and thus indicated the presence of DNAPL in the soil. Therefore, his opinion was not contrary to the published data and reports; rather, it used that data and applied a different and professionally accepted standard. Robertson's conclusion is, moreover, in accord with the conclusion drawn by Dico's consultant, Eckenfelder, that DNAPL was probably present in the soil at Dico's facility. See, e.g., Tr. at 147. The District Court did not abuse its discretion by refusing to preclude Robertson's testimony on this basis.

Third, Dico asserts that Robertson's testimony is unreliable because his findings are, in at least three instances, based upon insufficient data. Again, because "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination," the District Court properly refused Dico's invitation to

exclude Robertson's testimony on this ground. <u>Loudermill v. Dow Chem. Co.</u>, 863 F.2d 566, 570 (8th Cir. 1988) (holding district court did not abuse its discretion by admitting expert testimony challenged by defendant as being "insufficiently supported by facts"); <u>accord</u> <u>Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.</u>, 125 F.3d 1176, 1183 (8th Cir. 1997) (same).

In sum, Dico's objections to the District Court's decision to admit Robertson's expert testimony amount to an argument that the District Court should have given more weight to Dico's expert's interpretation of the data at issue.[8] Dico has not pointed to any deficiency in the reliability of Robertson's testimony that would lead us to conclude the District Court abused its discretion.

B.

Hydrogeologist Abdul S. Abdul provided expert testimony on behalf of Dico. The District Court excluded several opinions offered by Abdul because they were not contained in his expert report or otherwise disclosed to the United States prior to the bench trial. Dico argues that the District Court erred.

Dico's objection to the District Court's ruling on Abdul's opinion testimony is without consequence. The court specifically stated that "the outcome of the litigation would not change even if the above opinions were admitted due to the fact [that] Dr.

---

[8]Dico's argument that the District Court misapplied the burden of proof on the admissibility of Robertson's testimony is without merit. The record shows that the government laid an adequate foundation for the admission of his testimony. "Vigorous cross-examination [and] presentation of contrary evidence . . . are the traditional and appropriate means of attacking shaky but admissible evidence." <u>Daubert</u>, 509 U.S. at 596. By noting that Dico failed to present evidence of any other methodology that Robertson should have applied, the court merely emphasized that Dico's <u>Daubert</u> challenge was not, in the court's view, well-founded.

Abdul and Dico has [sic] failed to establish a clear connection between the contamination found in the MLKE project area and that pulled from the groundwater beneath the Dico property." United States v. Dico, Inc., No. 4-95-10289, at 18 n.12 (S.D. Iowa Feb. 14, 2000) (Ruling on Liability and Order Setting Hearing Date). Furthermore, the excluded opinions, even if considered, would not persuade this court that the District Court erred in its ruling on the admission of Robertson's testimony (or, for that matter, in its findings on causation, see infra pt. III). See supra pt. II.A.

C.

Dico argues that the District Court abused its discretion in admitting deposition testimony from three witnesses that the government offered into evidence after both sides had rested their cases. Dico had filed pretrial motions to exclude these depositions, but the District Court had ruled that the deposition testimony was admissible. The government did not specifically offer the depositions during its case-in-chief. After Dico finished presenting its case, the District Court asked the government's counsel about the depositions. The government responded that it had intended to offer the deposition testimony, but that it had apparently misunderstood the court's procedure regarding when and how that testimony would be admitted. The government indicated that it would like to have the testimony admitted and, over Dico's objections, the court admitted the deposition testimony into evidence after the close of Dico's case.

It has been our long-standing judgment that "[a] court has, of course, the general power to reopen a case, either on motion of a party or on its own motion, while the matter is still under advisement, for the receipt of further evidence." Arthur Murray, Inc. v. Oliver, 364 F.2d 28, 34 (8th Cir. 1966). Nonetheless, "it is not the business of a court to make additions of evidence in a submitted case on its own motion other than as there may be some element of such probative importance that its addition will

prevent a miscarriage of justice from occurring in the situation." Id. We review the exercise of such power for an abuse of discretion. See id.

We hold that the District Court did not abuse its discretion by admitting the disputed deposition testimony offered by the government. At the time the court decided to admit the disputed testimony, the court offered Dico the opportunity to present additional evidence in response to it. See Briscoe v. Fred's Dollar Store, Inc., 24 F.3d 1026, 1028 (8th Cir. 1994) ("It is not an abuse of discretion for a district court to reopen a plaintiff's case where a defendant is given an opportunity to challenge the new evidence introduced."); see also Ingram v. Mo. Pac. R.R. Co., 897 F.2d 1450, 1455 n.5 (8th Cir. 1990) (finding no abuse of discretion where plaintiff was permitted to introduce evidence after both sides had rested). Moreover, Dico was not surprised by the government's evidence; it had been the subject of pretrial motions and a pretrial order, and Dico had submitted counterdesignations of deposition testimony to be admitted in response to the sections offered by the government. The court unambiguously assured Dico that it would consider both the government's designations and Dico's counterdesignations. Finally, the court allowed Dico the opportunity to review the testimony as it was marked and submitted in the court's bench book to further ensure that Dico was satisfied with the manner in which the testimony and Dico's counterdesignations were submitted. The District Court exercised great caution in affording Dico an adequate opportunity to respond to the testimony at issue. We see no abuse of discretion in the District Court's actions.

III.

Dico next challenges the judgment against it by arguing that the government failed to meet its burden of proof on causation. Dico attacks the two factual findings upon which the District Court's liability holding rests. The District Court found that releases of hazardous substances occurred on Dico's property and that a causal nexus exists between these releases and the groundwater contamination at the Site. As part

of the second finding, the court found that the hazardous materials released on Dico's property migrated through the soil to reach and contaminate the groundwater. We review these findings of fact for clear error. Control Data Corp. v. S.C.S.C. Corp., 53 F.3d 930, 938 (8th Cir. 1995).

A.

CERCLA defines "release" to mean "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing" of hazardous wastes "into the environment." 42 U.S.C. § 9601(22) (emphasis added). The District Court found that TCE was released into the soil on Dico's property in four ways. First, "some quantity of TCE leaked from known cracks in the degreasing vat through the concrete containment pit and into the ground underneath." United States v. Dico, Inc., No. 4-95-10289, at 10 (S.D. Iowa Feb. 14, 2000) (Ruling on Liability and Order Setting Hearing Date). Second, "Dico routinely dumped and spread sludge containing TCE residue directly on its property." Id. Third, small quantities of TCE leaked during the filling of storage drums with TCE. Id. Fourth, railcars delivering TCE to Dico dripped the chemical onto the soil while on Dico's property. Id. Ample evidence in the record supports the District Court's finding that Dico released TCE and that it reached the soil.

1. TCE Leaks

The government presented evidence of numerous TCE leaks. William O'Brien, a former Dico employee, stated in his deposition testimony that in 1975 he discovered a significant leak in the degreaser. The degreaser was using an unusually large amount of TCE, and when O'Brien had the degreaser pulled out of its concrete containment pit for examination, he observed cracks in the bottom of the degreaser. Despite these cracks, he found no TCE pooled in the containment pit. Dep. of William J. O'Brien, July 12, 1995, at 56-57, 136-37. O'Brien described the absence of pooled TCE as an

"amazing thing." Id. at 136. John Harold Strouf, a retired president of Dico, also testified to leaks in the degreaser. Strouf confirmed that Dico used at least two degreasers, one installed above ground and one installed in a concrete pit. Dep. of John Harold Strouf, Sept. 30, 1996, at 37. He testified that leaks from the degreaser tanks were caused by holes torn in the sides during the raising and lowering of the baskets containing parts to be degreased. Id. at 41-42.

Moreover, O'Brien testified that the company disposed of sludge containing TCE, collected from the bottom of the degreaser, by dumping the sludge on the ground about 100 feet from the production building and covering it with fill material and dirt. Dep. of William J. O'Brien at 27; see also id. at 40-41 (during 1950s TCE waste sludge from degreaser was dumped on property but in different location). Strouf testified that Dico took the TCE sludge from the bottom of the degreaser and used it as a dust suppressant on roadways around the Dico facility. He stated that this practice was already established before he started working at Dico in 1960, and that as many as two fifty-five gallon barrels of sludge were removed from the company's degreasers each time they were cleaned. Dep. of John Harold Strouf at 44-45.

Finally, the record contains further evidence of leaks resulting from the chemical supply business that Dico ran from 1946 until 1980. TCE arrived at Dico's facility in railcars, from which Dico pumped the TCE into above-ground storage tanks and later into drums for resale to industrial users. The record shows that railcars delivering TCE to Dico sometimes leaked TCE onto the ground. Tr. at 266-68. Furthermore, the record reveals that some TCE leaked in the process of transferring the TCE from the storage tanks to smaller drums for commercial distribution. Arthur Dale Hilliard, Jr., a former Dico employee, testified that he witnessed drums leaking TCE in the drum storage area. Tr. at 263.

## 2. TCE Entered Soil

Dico further suggests that even if TCE and TCE sludge leaked or was dumped on its property, the District Court clearly erred in concluding that those TCE spills entered the soil. Despite this assertion, the record contains evidence of at least three sources of releases directly onto the soil: from railcars dripping TCE onto the ground, from dumping TCE sludge on the ground and covering it with fill material, and from spreading TCE as a dust suppressant directly onto the soil. See supra pt. III.A.1. While Dico asserts that Abdul's testimony that any TCE spread or leaked on top of the soil would only penetrate one foot deep is conclusive, other evidence contradicts his assertion. Robertson testified that TCE is heavier than water and it sinks through the soil unless impeded by some less-permeable barrier. He explained that TCE moves more quickly than water through the soil because it is less viscous. Tr. at 38. Coupled with Strouf's testimony regarding the quantity of sludge buried and spread on Dico's property, the District Court did not clearly err in concluding that releases of TCE on Dico's property penetrated the soil to a depth greater than one foot.

Dico also argues that the government offered no proof regarding how TCE moved into the soil through the walls of the concrete containment pit holding the degreaser or through the concrete slab in the drum storage area. Abdul testified that TCE does not move through concrete at any significant rate; Robertson testified that TCE penetrates concrete, both in its liquid and its vapor phases, because it is a heavy chemical and is less viscous than water. Robertson noted that some of the highest concentrations of contamination at the Site were found below these concrete slabs and that, in his experience, high concentrations of TCE are often found under concrete-lined containment pits. The expert testimony on this question of causation conflicted. Weighing the testimony of both experts, the District Court found Robertson's testimony more persuasive and credible. United States v. Dico, Inc., No. 4-95-10289, at 17-20 (S.D. Iowa Feb. 14, 2000) (Ruling on Liability and Order Setting Hearing Date).

Nothing Dico has argued convinces us that the District Court clearly erred in so concluding. See Lansford-Coaldale Joint Water Auth. v. Tonolli Corp., 4 F.3d 1209, 1218 n.7 (3d Cir. 1993) (concluding that the court would "not disturb the district court's decision to credit the reasonable testimony of one of two competing experts," particularly where their differences rest on a different interpretation of the same data). The record, taken as a whole, shows evidence in support of each basis for the District Court's conclusion that Dico released TCE on its property. We hold that the court did not clearly err in making this factual finding.

B.

Dico mounts a similar challenge to the court's finding that TCE migrated through the soil and into the groundwater on Dico's property. Dico argues that the District Court based its finding entirely on theories drawn from Robertson's testimony, and that because his testimony was unreliable and should have been excluded, no basis exists for the finding and it is clearly erroneous. As we previously concluded, the District Court did not err in admitting Robertson's testimony. See supra pt. II.A. Therefore, Dico's challenge also fails. In response to Dico's assertion that allowing the court to rely on such "circumstantial evidence of proximity" ignores our opinion in Dico II, we emphasize that our decision in that portion of this litigation merely reversed a grant of summary judgment. We found a material issue of fact, appropriate for resolution at trial, on the question of causation. Dico II, 136 F.3d at 579. We did not hold that, once the government had been put to its proof on this claim, such evidence could never form the basis of a judgment in favor of the EPA.

In any event, our review of the record reveals that the government presented evidence that TCE migrated through the soil into the groundwater, that Dico presented evidence to the contrary, and that the District Court found the government's evidence more compelling. Given the evidence the District Court had before it, we cannot say

the court clearly erred in finding that Dico's releases of TCE migrated into the groundwater and caused the contamination at issue.

## IV.

Dico also challenges the District Court's grant of summary judgment to the government on the quantum of cleanup costs that would be awarded. The court awarded the government $4,129,426.67 in costs attributable to the EPA's efforts to remediate the Site's groundwater contamination. As part of these costs the court awarded $508,284.76 for indirect costs,[9] $730,060.74 for oversight costs,[10] and $370,453.57 for attorney fees and litigation costs. Dico contends that these costs are not recoverable as a matter of law under CERCLA and the District Court should not have allowed the government to recover any costs in these categories. We review this question of statutory interpretation de novo. Braswell v. City of El Dorado, 187 F.3d 954, 958 (8th Cir. 1999).

CERCLA's cost recovery provisions specifically allow the government to bring suit to recover "all costs of removal or remedial action incurred . . . [that are] not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(1)(A). The statute defines "remedial action" as including

> such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction,

---

[9]Indirect costs include "costs expended for the operation of the Superfund program to support site-specific cleanup activities." United States v. Dico, Inc., No. 4-95-10289, at 2 (S.D. Iowa Mar. 28, 2000) (order granting summary judgment on response costs).

[10]Oversight costs encompass "costs incurred by the EPA in overseeing activities conducted by private parties other than EPA contractors." Id.

-16-

segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, <u>onsite treatment</u> or incineration, provision of alternative water supplies, <u>and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment</u>.

<u>Id.</u> § 9601(24) (emphasis added).  CERCLA further provides that "all such terms," including response, removal, and remedial action, "include enforcement activities related thereto."  <u>Id.</u> § 9601(25).

A.

Dico contends that the definitions found in CERCLA do not encompass recovery of the indirect and oversight costs incurred by the EPA in connection with the remedial activities undertaken at the Site.  Dico relies on the Third Circuit's opinion in <u>United States v. Rohm & Haas Co.</u>, 2 F.3d 1265 (3d Cir. 1993), to argue that we must apply the clear statement doctrine, as set forth in <u>National Cable Television Ass'n v. United States</u>, 415 U.S. 336 (1974),[11] to decide whether 42 U.S.C. § 9607(a) authorizes the

---

[11]In <u>National Cable</u>, the Supreme Court reviewed fees that the Federal Communications Commission sought to impose upon community antenna television (CATV) systems.  Pursuant to the Independent Offices Appropriation Act, the FCC sought to impose fees on CATV systems that would reimburse the FCC for both the direct and indirect costs of regulating the CATV industry.  The Court struck down the FCC's proposed fee structure.  Imposing such regulatory costs on the CATV systems would, in essence, allow the FCC to tax the systems.  To avoid the constitutional dilemma presented by such an interpretation, the Court defined the charges imposed upon the systems as a "fee," which by definition must be an amount paid to the agency for some benefit to the recipient "not shared by other members of society," such as permission to conduct a particular trade.  415 U.S. at 341.  The fees could be based only upon the FCC's direct costs, i.e., things that provided a direct benefit to individual cable systems.  But because the "fees" proposed by the FCC included reimbursement for monies spent for the benefit of the general public, the Court remanded to the FCC

-17-

recovery of oversight costs and indirect costs. In <u>Rohm</u>, the Third Circuit analyzed the EPA's request pursuant to CERCLA for recovery of costs incurred in "overseeing a hazardous waste cleanup performed and paid for by a private party." 2 F.3d at 1267. Both parties in <u>Rohm</u> agreed that the activities at issue fell under CERCLA's definition of removal activities, rather than remedial activities. <u>Id.</u> at 1271. Therefore, the <u>Rohm</u> court analyzed the recovery of oversight costs in the context of the 42 U.S.C. § 9601(23) definition of "removal." The court concluded that the statute lacks the clear statement mandated by <u>National Cable</u>, and therefore oversight costs are not recoverable by the EPA. <u>Rohm</u>, 2 F.3d at 1278.

We respectfully disagree with the Third Circuit's analysis. The statutory scheme at issue in <u>National Cable</u> involved the imposition of user fees on parties regulated by the FCC for the benefit of conducting communications-related business. Conversely, CERCLA is a remedial statute designed to make parties responsible for introducing hazardous waste into the environment pay for cleaning up the messes they have created. <u>See</u> <u>United States v. Lowe</u>, 118 F.3d 399, 401-03 (5th Cir. 1997) (discussing remedial nature of CERCLA). The provisions allowing the EPA to recover costs are meant to make the guilty parties pay and thus are not like the user fees at issue in <u>National Cable</u>. <u>See</u> <u>Lowe</u>, 118 F.3d at 400-03 (holding the <u>National Cable</u> analysis to be inappropriate in the CERCLA context because CERCLA is a remedial statute; it does not impose user charges on a regulated industry, and therefore the clear statement doctrine does not apply to cost-restitution awards in CERCLA cases); <u>Atl. Richfield Co. v. Am. Airlines, Inc.</u>, 98 F.3d 564, 568 (10th Cir. 1996) ("CERCLA response costs are not user fees or taxes . . . . EPA oversight costs are not fees or taxes levied against innocent members of a regulated industry to pay the EPA's general administrative costs, but part of the damages caused or contributed to by specific persons."); <u>cf.</u> <u>United States v. Hyundai Merch. Marine Co.</u>, 172 F.3d 1187, 1189-90 (9th Cir.), <u>cert. denied</u>, 528 U.S. 963 (1999) (holding, in action brought pursuant to the

to revise the proposed fee structure.

-18-

Oil Pollution Act of 1990, that language allowing the United States to recover "removal costs" encompassed costs of monitoring Hyundai's private cleanup efforts; rejecting Hyundai's argument that National Cable should apply by pointing out that recovery of these types of costs does not constitute a tax). We are persuaded, as the Tenth Circuit held in Atlantic Richfield, that "Rohm & Haas departed significantly from prior case law that had construed the cost recovery provisions of CERCLA broadly." 98 F.3d at 568. We decline to adopt the Third Circuit's narrow approach. Accord United States v. Chromalloy Am. Corp., 158 F.3d 345, 349 (5th Cir. 1998) ("The government's oversight costs in a responsible party clean-up are response costs under CERCLA.").

Furthermore, even if we were to apply the National Cable clear statement doctrine, we would conclude that its requirements are met with regard to CERCLA's cost recovery provisions for remedial (as opposed to removal) actions. As the court pointed out in Atlantic Richfield, the Third Circuit only addressed CERCLA's language defining removal actions under § 9601(23). CERCLA defines remedial actions more broadly to include "any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment." 42 U.S.C. § 9601(24) (emphasis added). This language provides the specific congressional delegation of authority to the EPA that the clear statement doctrine of National Cable, as interpreted in Rohm & Haas, seems to require. Thus, even under the more restrictive approach advocated by Dico, we would conclude that oversight and indirect costs are recoverable in remedial actions under CERCLA.

B.

Dico also contends that the definitions found in CERCLA do not encompass recovery of the government's attorney fees, and that even if attorney fees are authorized the government bears the burden of proving that the fees requested are reasonable. We reject Dico's challenge on both grounds. First, the language of the statute provides that attorney fees are recoverable as response costs under CERCLA.

-19-

<u>See</u> 42 U.S.C. § 9601(25) (stating that the terms response, removal, and remedial action "include enforcement activities related thereto"); <u>United States v. Gurley</u>, 43 F.3d 1188, 1199-1200 (8th Cir. 1994), <u>cert. denied</u>, 516 U.S. 817 (1995) (affirming award of attorney fees to government under 42 U.S.C. § 9601(25) and § 9607(a)(4)(B) for work done by EPA legal staff and Department of Justice attorneys).[12]

Second, we reject Dico's argument that the government bears the burden of proving that its requested attorney fees are reasonable. We specifically addressed this argument in <u>United States v. Northeastern Pharmaceutical & Chemical Co.</u>, 810 F.2d 726 (8th Cir. 1986) (<u>NEPACCO</u>), <u>cert. denied</u>, 484 U.S. 848 (1987), and held that the party claiming that costs are unreasonable has the burden of proof. We examined the statutory cost-recovery language applicable to the government's request for reimbursement of costs, and noted that it provides that the "government may recover from responsible parties '<u>all costs</u> of removal or remedial action . . . <u>not inconsistent</u> with the'" National Contingency Plan (NCP). <u>NEPACCO</u>, 810 F.2d at 747 (emphasis added) (quoting 42 U.S.C. § 9607(a)(4)(A)). We concluded that this language created the conclusive presumption that all costs incurred by the government that are <u>not</u> inconsistent with the NCP are, in fact, reasonable costs. <u>Id.</u> at 748. Dico therefore bears the burden in this litigation of proving that the government's requested recovery costs, whether attorney fees or otherwise, are inconsistent with the NCP.[13] <u>See also</u>

_____

[12]We note that the Supreme Court's decision in <u>Key Tronic Corp. v. United States</u> offers little guidance on the issue of the government's recovery of attorney fees as part of its "enforcement activities" under CERCLA. 511 U.S. 809, 819 (1994) ("Though we offer no comment on the extent to which [enforcement activity] forms the basis for the Government's recovery of attorney's fees through § 107, the term 'enforcement activity' is not sufficiently explicit to embody a private action under § 107 to recover cleanup costs.").

[13]Dico argues that the Ninth Circuit's decision in <u>United States v. Chapman</u>, 146 F.3d 1166 (9th Cir. 1998), required the District Court to limit the government's attorney fees award to those fees reasonably, not actually, incurred. We note that the decision

Chromalloy Am. Corp., 158 F.3d at 352 n.3 ("The burden of proving inconsistency with the NCP rests with the responsible party."). Presumably, any attorney fees that were not reasonably incurred would be held inconsistent with the NCP (else there would appear to be no limiting principle to a claim by the government for attorney fees as part of CERCLA response costs), but the burden would be on the responsible party to show unreasonableness. Dico has not attempted to show that the fees requested are inconsistent with the NCP.

We affirm the District Court's grant of summary judgment awarding the government a recovery of its costs incurred in connection with the cleanup of the Site and establishing the amount of that recovery.[14]

V.

Before this case went to trial, Dico moved to add two affirmative defenses to its answer. Dico sought to argue that the EPA's claim would "effect an unconstitutional taking of private property" in violation of the Takings Clause of the Fifth Amendment, and would "deprive Dico of property without due process of law" in violation of the

---

of the Ninth Circuit is not binding on this Court, and, though the decision reaches a result that we find attractive, we must respectfully reject that court's analysis of the CERCLA fee issue. The Ninth Circuit applied the Supreme Court's decision in Hensley v. Eckerhart, 461 U.S. 424 (1983), to the award of fees under CERCLA. The facts of Hensley are quite distinguishable—the fee award at issue was determined under the prevailing-party provisions of 42 U.S.C. § 1988. In this Circuit, we have not applied Hensley to an award of fees under CERCLA. CERCLA makes no mention of fee awards to "prevailing parties." Moreover, the Act's language indicates that fee awards, as with other response costs, must merely be consistent with the NCP.

[14]Furthermore, we find Dico's argument that a material issue of fact remains regarding the calculation of attorney fees, based upon pending litigation against the Department of Justice, to be completely without merit.

Due Process Clause of the Fifth Amendment. In essence, Dico's proposed defenses challenge the retroactive application of CERCLA to Dico's activities. The United States moved under Federal Rule of Civil Procedure 12(f) to strike these defenses as foreclosed by our decision in NEPACCO. 810 F.2d at 726 (upholding the constitutionality of retroactive application of CERCLA under both the Due Process and Takings Clauses of the Fifth Amendment). The District Court granted the United States's motion. We review for an abuse of discretion. See Nationwide Ins. Co. v. Cent. Mo. Elec. Coop., No. 00-2012, 2001 WL 856259, at *5 (8th Cir. July 31, 2001); see also Stanbury Law Firm v. IRS, 221 F.3d 1059, 1063 (8th Cir. 2000) (noting that district courts enjoy "liberal discretion" under Rule 12(f)).

Dico argues that the Supreme Court's decision in Eastern Enterprises v. Apfel, 524 U.S. 498 (1998) (addressing Fifth Amendment challenge to Coal Industry Retiree Health Benefit Act of 1992), supersedes our due process and takings holdings in NEPACCO. We reject Dico's argument for two reasons. First, no single Fifth Amendment rationale commanded a majority of the Court's votes in Eastern. Four Justices voted to strike down the statute as unconstitutional based upon a Takings Clause analysis. 524 U.S. at 537. The fifth vote for striking down the statute rejected the takings analysis and held that the statute violated the Due Process Clause. Id. at 550 (Kennedy, J., concurring in the judgment and dissenting in part). Second, the background and purpose of the Coal Industry Retiree Health Benefit Act differs greatly from that of CERCLA; Congress intended CERCLA to apply retroactively and acted purposefully to allocate the cost of hazardous waste cleanups sites "to those who were responsible for creating the sites." Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc., 240 F.3d 534, 552 (6th Cir. 2001) (holding that Eastern has no precedential effect because no majority agreed on a rationale for striking down the statute, and also holding that Eastern has no effect on the constitutionality of retroactively applying CERCLA's provisions).

In sum, we are unpersuaded by Dico's challenge to CERCLA on Fifth Amendment grounds. We previously resolved the constitutionality of CERCLA's

retroactive application in <u>NEPACCO</u>, and we are unpersuaded that the Supreme Court's decision in <u>Eastern</u> undermines <u>NEPACCO</u>.  The District Court did not abuse its discretion in granting the government's motion to strike these constitutional defenses from Dico's answer.  <u>Cf.</u> <u>United States v. Winnebago Tribe</u>, 542 F.2d 1002, 1007 (8th Cir. 1976) (upholding district court's striking of defense where federal statute clearly authorized appellee's activities).

VI.

In summary, we reject Dico's challenges to the District Court's evidentiary rulings and to its factual findings on causation regarding Dico's liability for TCE contamination at the Site.  The District Court appropriately granted summary judgment on the government's request for its costs incurred in connection with the cleanup at Dico's facility, and did not err in striking Dico's constitutional defenses.  The judgment of the District Court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.