**UNITED STATES of America,
Plaintiff,**

v.

**DOMENIC LOMBARDI REALTY,
INC., Defendant.**

**C.A. No. 98–591S.**

United States District Court,
D. Rhode Island.

Oct. 17, 2003.

Michael P. Iannotti, U.S. Attorney Office, Providence, RI, Andrew M. Eschen, David L. Weigert, David L. Gordon, J. Tom Boer, Esq., U.S. Department of Justice, Environmental Enforcement Section, Norman O. Hemming, Francis X. Lyons, U.S. Dept. of Justice, Environmental/Naturaly Resources Div., Washington, DC, Peter DeCambre, U.S. Environmental Protection Agency, Boston, MA, for Plaintiff.

Perry D. Wheeler, Cranston, RI, Richard E. Gardiner, Fairfax, VA, for Defendant.

## DECISION AND ORDER

SMITH, District Judge.

In this action, the United States of America ("United States" or "Government") seeks to recover costs from Defendant Domenic Lombardi Realty, Inc. ("Lombardi Realty" or "Defendant") on behalf of the Rhode Island Department of Environmental Management ("RIDEM") and the United States Environmental Protection Agency ("EPA"). The costs for which the Government seeks reimbursement were incurred during the clean-up of environmental contamination at what now is known as the Robin Hollow Road Site in West Greenwich, Rhode Island (the "Robin Hollow Road Site" or "Site"). The action was brought pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9607.

This is the final chapter in the long story of the Robin Hollow Road Site. On June 7, 2002, Senior U.S. District Judge Ronald R. Lagueux issued a written decision that partially adopted a Report and Recommendation ("R & R") of United States Magistrate Judge David L. Martin. That decision held that the presence of PCB-contaminated soil on the Robin Hollow Road Site constituted a "release" as defined by 42 U.S.C. § 9607. *See United States v. Domenic Lombardi Realty, Inc.,* 204 F.Supp.2d 318, 329–30 (D.R.I.2002). However, Judge Lagueux denied EPA's Motion for Summary Judgment with respect to Lombardi Realty's liability for the release. Judge Lagueux found that genuine issues of material fact existed regarding Lombardi Realty's ability to take advantage of the so-called "innocent landowner defense," contained in CERCLA's third party defense provision. *See* 42 U.S.C. § 9601(35)(A). After Judge Lagueux determined that a trial was required on this limited issue, this case was transferred to this writer. The sole issue at trial was whether Lombardi Realty could absolve itself of liability for the costs of the clean-up by proving it was an innocent landowner under CERCLA. This Court held a bench trial on this matter during the week of April 21 through April 25, 2003, and on May 12, 2003. The parties filed extensive post-trial submissions on June 17, 2003.

After considering all of the evidence, which remarkably (given the narrow issue) includes 403 factual stipulations, six days of live witness testimony, and hundreds of exhibits, as well as the parties' written arguments, this Court finds that Lombardi Realty has failed to prove that it was an innocent landowner. Lombardi Realty is therefore liable for the response costs incurred by the EPA and RIDEM in connection with the clean-up of the Robin Hollow Road Site. Accordingly, as set forth below, judgment shall enter for Plaintiff, and against Defendant.

## I. *Findings of Fact*

### A. Armand Allen's Ownership of the Land, and Its Sale to Domenic Lombardi Realty, Inc.

During the early to mid–1980s Armand Allen ("Allen") owned thirty-one acres of property located off of Robin Hollow Road in West Greenwich, Rhode Island. During his period of ownership, Allen began construction of a home on the property, but never completed the structure. Allen, along with his wife, Haroldean Allen, lived in a sixty foot trailer on the Site. Although he never obtained the licenses required to operate a junkyard, Allen stored a number of junk cars and trucks on his property in various states of disrepair during his ownership of the land. The Town of West Greenwich denied Allen's multiple applications for a junkyard license, but never ordered him to clean up his property.

In the fall of 1986, Domenic J. Lombardi ("Lombardi"), an employee of Lombardi Realty[1] approached Allen regarding a "For Sale" sign that was posted at the Site. Allen indicated that his price for the property was $135,000, but that he was willing to drop the price to $85,000 in order to make a quick sale. Lombardi testified that while he was on the property, he noticed stripped-down cars and trucks, as well as other solid waste. Lombardi directed his real estate agent, Ray Walsh, to make an offer on the property of $85,000, which Allen immediately accepted on December 11, 1986. Lombardi testified that he believed Allen was willing to accept such a low bid on the property for two

reasons: (1) Allen was being investigated by state and local police for operating a junkyard without a license; and (2) Allen had an ongoing matter in Florida that required his immediate attention.

Lombardi testified that Allen informed him that at one time he stripped electrical transformers on the Site in order to retrieve their copper. To support this contention, Lombardi Realty presented Herbert Plympton ("Plympton"), a truck driver who claimed to have delivered a truck-load of transformers to Allen at the Site sometime between 1982 and 1985. Plympton's testimony, however, did little to lend support to Lombardi's claim. First, Plympton's credibility is highly questionable. He was convicted and sentenced to 41 months in federal prison for receiving, storing, concealing, and disposing of stolen goods. Moreover, the First Circuit Court of Appeals found that a two-level increase in his sentence for those offenses was proper because he had lied to the District Court. *See United States v. Black*, 78 F.3d 1, 3–4 (1st Cir. 1996). Second, despite numerous witnesses who testified regarding the pungent odor of PCBs[2], Plympton testified that he smelled "nothing" when he observed Allen removing the transformers from his truck. As will be described *infra*, the PCBs contained in transformers have an unmistakable, pungent odor that Plympton almost certainly would have sensed had he in fact delivered the transformers. Third, Plympton was not revealed to the Government or this Court as a witness until the first day of trial.[3]

1. Lombardi Realty, incorporated in Rhode Island, is a residential and commercial property management company. Its business includes purchasing, refurbishing, and managing properties.

2. PCBs are "hazardous substances" under CERCLA, 40 C.F.R. § 302.4 ("List of Hazardous Substances and Reportable Qualities").

3. While the Court takes defense counsel at his word that he learned of Mr. Plympton as a potential witness as the trial was beginning, the story told by Lombardi to his counsel—

Lombardi's testimony regarding Allen's statements about the presence of transformers is also not credible and lacks corroboration. Like Plympton, Lombardi is a convicted felon.[4] Moreover, the only testimony that Lombardi Realty offered to prove that electrical transformers may have been disposed of on the property by Mr. Allen was that of Plympton and Lombardi, two men whose extensive criminal activities and history of lying in court makes their testimony (without corroboration) effectively worthless.

To contradict Lombardi and Plympton's testimony, the Government presented testimony of Haroldean Allen by way of excerpted portions of her video deposition. Ms. Allen testified that she never saw her husband bring transformers onto the property. While Ms. Allen's testimony is somewhat unclear on this point, her testimony is more credible than that of Lombardi and Plympton. While the Court believes that Allen did, in fact, operate some kind of scrap yard for old cars and car parts on the property, the Court finds no credible evidence to support the Defendant's contention that prior owners of the Site deposited PCBs on it.

Lombardi employed the assistance of Ray Walsh, a real estate agent, during the purchase of Allen's property on Robin Hollow Road. At trial, Walsh testified that, in preparation for the purchase of the property, he obtained a plat map of the property from the West Greenwich City Hall in order to approximate the future assessment of taxes that Lombardi would incur by owning the property. Walsh further testified that he did not perform any additional background investigation, such as an environmental assessment or a walk around the property, nor did he contact the local authorities regarding information on the use of the property. Walsh testified that it was not customary in 1986 to perform environmental assessments when purchasing residential property.

The Government, on the other hand, offered the expert testimony of Peter Scotti, a broker and appraiser of Rhode Island real estate for approximately thirty years. Mr. Scotti testified that, even in 1986, at least a Phase II environmental assessment[5] of the property should have been conducted, especially if Lombardi knew that Allen had disposed of waste on the property.[6] This Court credits Scotti's testimony and finds that the applicable indus-

---

that he had a chance encounter with Plympton at the Dunkin Donuts in West Warwick, which led to a conversation between the two men and Plympton's recollection of his delivery of transformers to Allen, strains credulity.

4. Lombardi's criminal record is extensive. On July 8, 1977, Lombardi was convicted of obtaining goods under false pretenses in violation of Rhode Island law. Lombardi then committed this crime a second time and was convicted on April 24, 1979. On March 5, 1981, Lombardi was also convicted of (1) conspiracy; (2) destroying a building other than a dwelling; (3) possession of explosives without a license; and (4) fraudulent use of a credit card. Lombardi has also been convicted of Use of a Firearm to Commit a Federal Crime, 18 U.S.C. § 844(h), Money Launder-

ing, 18 U.S.C. § 1957, and Mail Fraud, 18 U.S.C. § 1341, all of which are crimes associated with setting fire to a trailer located on the Robin Hollow Road Site and rented to Margarita Broadhurst, one of his tenants.

5. An environmental assessment is a type of "due diligence" a purchaser might conduct when buying real estate. A Phase I assessment is a review of public records concerning the property. A Phase II assessment is generally more intrusive, and involves boring into the soil, sampling, and laboratory analysis.

6. Lombardi Realty clearly knew that Allen's property had been used as a scrap yard. In a July 30, 1998 letter to the EPA, Lombardi admitted that he had knowledge of Allen's prior use of the land. *See* Ex. 142.

try standard, even in 1986, would dictate that at least a minimal environmental assessment should have been conducted by Lombardi prior to his purchase of the Site.

### B. Lombardi Realty's Ownership of the Property—The Discovery of PCBs

After purchasing the Allen property, Lombardi completed work on the partially-constructed, single-family home that Allen had left unfinished. Despite the presence of the house and trailer, the vast majority of the thirty-one acres of land remained open space with some wooded areas.

In 1987, Brian Prest ("Prest"), who lived near the Site, frequently rode his dirt bike on the property. He testified that he witnessed trucks dumping trash, including electrical transformers, on the Lombardi Realty property. He also stated that he frequently smelled unusual odors when on the land, and that prior to Lombardi's purchase of the land, it was "pretty clean." Tr. Tr. III 182:6.

In March of 1987, Lombardi began renting out the mobile home located on the Site. Margarita Broadhurst ("Broadhurst"), the new tenant, testified that she saw transformers amongst solid waste debris on the Site within a few months after moving into the mobile home.[7] Additionally, Pauline Lambert ("Lambert"), a friend of Broadhurst, testified that on one occasion she saw a Lombardi Realty truck on the Site that appeared to be carrying transformers. In November 1987, the State of Rhode Island, apparently unaware of Prest's, Broadhurst's, and Lambert's observations, became concerned over Lombardi's activities at the Site. On November 9, 1987, RIDEM issued a Notice of Violation ("NOV") and Order ("1987 NOV") to the Defendant via certified mail. The 1987 NOV notified Lombardi Realty that RIDEM had cause to believe that the Defendant permitted land at the Site to be used for disposal of solid waste without a license in violation of R.I. Gen. Laws 23–18.9–5. The 1987 NOV further ordered Lombardi Realty to remove all solid waste that had been disposed of at the Site.

On May 12, 1988, RIDEM inspected the Site and discovered an area of the property that was visibly stained with oil. RIDEM took a sampling of the stained soil to R.I. Analytical Laboratories, Inc. for analysis. Laboratory reports revealed that the sample contained 12,000 parts per million ("ppm") of PCBs (Aroclor 1260)[8] and 18 ppm of PCBs (Aroclor 1242). On May 27, 1988, RIDEM issued a second NOV ("1988 NOV") to the Defendant by certified mail. The 1988 NOV notified the Defendant that the May 12th inspection had revealed large quantities of refuse along with empty drums that had been left at the Site without a license, in violation of Rhode Island law and numerous environmental regulations. At this time, RIDEM ordered Lombardi Realty to remove all of the solid wastes dumped upon the Site, to submit to RIDEM a ground water sampling plan for the Site, and to pay an

---

7. Broadhurst testified that Lombardi told her he was only dumping clean dirt. She believed him until, as she put it "I had rats come on the porch, and they looked ill, and then I said, well, maybe they're making a dumping area out of it, you know." Tr. Tr. IV 41:19–21. When asked why she thought the rats were sick, Broadhurst testified that "[the rats] wouldn't walk right. They were just sick. They wasn't afraid of you." Tr. Tr. IV 42:10–11.

8. The term "Aroclor" is a common trade name for PCBs. PCBs were manufactured and sold as insulators. One of the largest manufacturers of PCBs was Monsanto Corp., which marketed the insulating material under the copyrighted trade name "Aroclor." The number accompanying the term Aroclor is an identifying characteristic that refers to a PCB measurement's chlorine level.

administrative penalty of $1,000. The 1988 NOV also notified Defendant that if it failed to request a hearing before RIDEM within a ten day period, the NOV would automatically become a compliance order. Lombardi Realty never requested a hearing.

During the summer of 1988, Jennifer Sustarsic ("Sustarsic"), along with her four children, moved into the trailer on the Robin Hollow Road property. Sustarsic testified that when she moved in she smelled an unusual, chemical odor. *See* Tr. Tr. I 145:1–4.

On December 17, 1988, RIDEM officials conducted a second inspection of the Site. At this time, RIDEM collected another soil sample from the same oil-stained area that was sampled on May 12, 1988. This sample contained 4,100 ppm of PCBs (Aroclor 1254) and 12 ppm of PCBs (Aroclor 1242).

Around the same time period that RIDEM had launched its initial investigation into the Robin Hollow Road Site, Prest observed objects on the Site that he believed were electrical transformers. In the spring of 1988, Prest was riding his bike down one of the trails in the wooded area of the Site when he ran over a partially buried telephone pole and was thrown from his dirt bike, sustaining an injury. Prest testified that he saw an electrical transformer attached to the pole, as well as several other transformers in the area that had not been there before. Prest further testified that he observed some of the transformers broken or split apart.

On cross-examination, however, defense counsel elicited that Prest, although he believed that he struck the telephone pole

on the Defendant's property, may actually have seen the transformers on adjacent property. Lombardi's property is identified as Lot 50 on the Town of West Greenwich's Plat 23. Lots 52 and 54, located to the southwest of Lombardi's property and also bordering on Robin Hollow Road, are owned by other landowners. Prest testified that when he had the accident, he was "heading toward the space between the house and the shed." Tr. III 194:8–9. In order to proceed in that direction, Prest indicated that he took the access road off of Robin Hollow Road. *See* Tr. III 191:5–7. However, after comparing Defendant's Exhibit V (a recent aerial map of the Site and surrounding properties) and Exhibit Q (an aerial map of the Site taken on March 2, 1988), it is clear that the area in which he was injured and saw transformers was actually on Lot 52 and therefore not on Lombardi's property. This Court finds that Prest, though believing he was injured while riding on Lombardi Realty's property, was actually on the property of another landowner.[9]

On February 17, 1989, RIDEM issued a third NOV ("1989 NOV") to Lombardi Realty via certified mail. The 1989 NOV notified the Defendant that the concentrations of PCBs found in the soil samples taken from the Site were hazardous as defined by Rhode Island law. The 1989 NOV ordered Lombardi Realty to: (1) inform all persons who come onto the Site of the terms of the order and permit RIDEM employees and agents to enter the Site to undertake sampling or investigation; (2) refrain from treating, storing or disposing of any additional hazardous waste at the

---

**9.** Prest's testimony revealed that, at best, he was unsure of the exact property lines of the land adjacent to Robin Hollow Road. *See* Tr. Tr. III 192:13–16. For example, Prest testified that he believed the shed he was heading towards was on Lombardi's property, but a review of Exhibits Q and V indicates that the shed was clearly on a neighbor's property. Moreover, Prest testified that he thought Lot 52 was owned by Lombardi Realty, despite the fact that Lombardi Realty only owned Lot 50. *See* Tr. Tr. III 192:21–25.

Site; (3) refrain from altering the Site without prior notification of RIDEM; (4) submit a sampling plan by March 20, 1989, for RIDEM's review and approval, that identifies all hazardous wastes located at the Site; (5) implement a sampling program approved by RIDEM within 10 days of such approval and submit all results of the sampling within three weeks of the approval; (6) apply to RIDEM for an EPA identification number and obtain proper hazardous waste manifests; (7) make arrangements with a qualified hazardous waste contractor for the removal of all hazardous wastes and proper disposal of all hazardous wastes at a licensed treatment, storage, or disposal facility (to facilitate compliance with this requirement, the NOV enclosed a list of permitted hazardous waste transporters); (8) submit to RIDEM, for approval, a written plan outlining the procedures to be followed for the cleanup and removal of all hazardous wastes at the Site by April 17, 1989; (9) implement an approved cleanup and removal plan within three weeks of its approval; and (10) notify RIDEM two days prior to the collection of samples and/or removal of waste from the Site. *See* Joint Stips. at ¶¶ 69–71. Lombardi Realty never complied with any of these orders. *See id.* at ¶¶ 78–86.

Despite RIDEM's numerous warnings regarding the state of the property, Lombardi Realty continued to violate environmental laws.

### C. Lombardi Realty's Ownership of the Property—The Cleanup of PCBs

On or about October 12, 1989, Lombardi Realty finally arranged for the removal of the contaminated soil. *See* Joint Stips. at ¶¶ 113–114. At the direction of Lombardi Realty, Robert Boyer ("Boyer"), an employee of Raven Construction Company and an agent of the Defendant, excavated approximately thirty-five cubic yards of oil-stained soil and placed it in a pile next to the pit. *See* Joint Stips. at ¶¶ 113–115. Boyer, however, was not licensed to handle or transport hazardous materials. The excavated soil was placed on polyplastic sheeting and then covered with an additional layer of polyplastic sheeting. *See id.* at 116. The Defendant did not place any barriers around the excavated soil to prevent runoff, nor is there evidence that RIDEM instructed the Defendant to use such a barrier. *See* Tr. Tr. I 152:14–16.

Following the excavation, RIDEM tested the soil that had been removed from the pit for PCB contamination, which revealed unacceptable levels of PCBs. Soil samples were also taken from the north, south, east, and west walls of the pit, as well as the bottom of the pit. RIDEM instructed Boyer and Lombardi that the pile of contaminated soil had to be removed from the Site by a licensed hazardous waste hauler before any further excavation. RIDEM also informed Boyer that any further excavation that occurred at the Site must be performed by an entity that was licensed to handle such a cleanup. *See* Joint Stips. at ¶ 127. In order to facilitate this request, RIDEM provided the Defendant with a sample list of companies that were licensed to perform this work.

During the spring of 1989, the Rhode Island State Police referred a number of complaints to RIDEM regarding the illegal disposal of waste occurring at the Site.

From November of 1989 through July of 1990, RIDEM warned Lombardi Realty on numerous occasions that the pile of contaminated soil needed to be removed from the Site. However, despite these continuous requests, the contaminated soil remained at the Site. On July 17, 1990, a RIDEM inspector visited the Site and observed that not only was the soil pile still

on the property, but it was also now uncovered. *See* Joint Stips. at ¶ 156. The disrepair of the polyplastic sheeting is corroborated by Prest, who testified that the sheeting was torn towards the end of 1989. Further, Sustarsic testified that she often observed the pile uncovered during rainstorms or when it was windy. She testified that Lombardi asked her on a number of occasions to replace the sheeting on the pile, but that she did not monitor the pile on a regular basis.[10] *See* Tr. Tr. I 153:2–16.

In early September 1990, Defendant conducted a second excavation of contaminated soil from the pit and created a second pile much like the first. RIDEM informed Lombardi Realty that this pile, along with the already existing pile, must be stored in a "roll off" container[11] if it was to remain at the Site. *See* Joint Stips. at ¶ 206. The Defendant never utilized a roll-off container, and the piles of soil remained uncovered.[12] *See* Joint Stips. at ¶ 246.

In 1991, John Lombardi, Lombardi's son, became president of Lombardi Realty. Joint Stips. at ¶ 271. In February of 1992, Lombardi was sentenced to prison for the arson of the trailer in which Broadhurst lived on the Site. Before he went to prison (and after, for that matter) Lombardi never informed his son of the seriousness of the PCB contamination on the Site. In fact, the evidence indicates that John Lombardi knew very little about the Robin Hollow Road property prior to becoming president of the company. Joint Stips. at ¶ 296. However, John Lombardi did learn of the piles of contaminated soil after assuming his role as president of Lombardi Realty. On one occasion, John Lombardi visited the Site and noticed that the piles of soil were only partially covered with a decaying tarp. Joint Stips. at ¶ 276. John Lombardi also acknowledged that local children were using the piles as ramps for their dirt bikes, but that he never informed them of the potential hazards of the PCBs. Joint Stips. at ¶ 278.

The Defendant and the Government continued their exchange through the early to mid–1990s, with the Government requesting that the Defendant comply with its remediation orders and the Defendant promising future remedial action. Alas, the Defendant did not comply with the Government's orders, and in July 1994 RIDEM requested the EPA's assistance. *See* Tr. Tr. II 143:9–12. In November of 1994, Gary Lipson ("Lipson"), an on-scene coordinator with the EPA, investigated the Site and determined that RIDEM's conclusions regarding the PCB pollution at the Site were correct. Accordingly, Lipson determined that an immediate CERCLA Removal Action was appropriate in order to remove the contamination.[13] *See* Pl.'s Ex. 114; Tr. Tr. II 144:1–4.

---

**10.** For example, Sustarsic testified that she stopped monitoring the pile of soil after Lombardi went to prison in February of 1992. *See* Tr. Tr. I 155:1–5.

**11.** A "roll off" is a container for waste that is constructed with wheels so that it may be rolled on and off a truck for purposes of transportation and disposal. Joint Stips. at ¶ 207.

**12.** There is evidence to suggest that the Defendant briefly obtained a roll-off container, but that it was never used to store or facilitate the removal of the contaminated soil. *See* Joint Stips. at ¶¶ 245–46.

**13.** Lipson determined that a time sensitive removal action was necessary as a result of the "extremely high" levels of PCBs found at the Site. Tr. Tr. II 147:14. The PCB measurements at the Site read over 1200 ppm. At the time, RIDEM's contamination limit was 1 ppm, and the EPA was using a 2 ppm standard. *See id.;* Pl.Ex. 16.

From February 21, 1995, through July 11, 1995, the EPA removed the contaminated soil from the Site and replaced it with clean backfill. In total, the EPA excavated approximately 900 tons of contaminated soil during the removal action, which included the 70 tons of soil previously excavated and placed in piles at the Site. On December 10, 1998, the EPA initiated this action seeking "reimbursement of response costs incurred or to be incurred by the United States in responding to the release or threat of hazardous substances into the environment from the Robin Hollow Road Superfund Site." Complaint ¶ 1. As of September 30, 2002, the EPA had incurred $481,068.51 in response costs.

## II. *Conclusions of Law*

### A. CERCLA Generally

CERCLA provides the EPA a mechanism to compel parties associated with contaminated property to clean-up, or pay for the clean-up, of the contaminated property. In order for the EPA to pursue successfully its CERCLA claim against Lombardi Realty, it must prove: (1) a release or threatened release of hazardous waste has occurred; (2) at a facility; (3) causing the EPA to incur response costs; and (4) that the defendant is a responsible party as defined by 42 U.S.C. § 9607(a). *See* 42 U.S.C. § 9607(a)(1)-(4). Here, it is either uncontested, or has been established at the summary judgment stage, that the EPA has met its burden with respect to these requirements. *See Domenic Lombardi Realty, Inc.*, 204 F.Supp.2d at 329–30. Accordingly, unless Lombardi Realty can take advantage of one of CERCLA's affirmative defenses, it will be held liable for the clean-up costs incurred by the EPA.

### B. The Innocent Landowner Defense

The affirmative defense asserted in this case is the innocent landowner defense. *See* 42 U.S.C. § 9601(35)(A)(i)-(iii). In 1986, Congress amended CERCLA by enacting the Superfund Amendments and Reauthorization Act ("SARA"). *See* Pub.L. No. 99–499, 100 Stat. 1614 (codified at 42 U.S.C. §§ 9601–9675 (2000)). In these amendments, Congress provided an affirmative defense for landowners who, innocently and in good faith, purchase property without knowledge that a predecessor in the chain of title had allowed hazardous substances to be disposed on the property. *See* Allan J. Topol and Rebecca Snow, *Superfund Law and Procedure* § 5.6 (1992). The innocent landowner defense provides a statutory defense to liability where the release of hazardous substances was due to "an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant. . . ." 42 U.S.C. § 9607(b)(3).

In order to assert this defense, the statute provided that a party must demonstrate, by a preponderance of the evidence, that (1) the contamination occurred prior to the defendant's purchase of the land; (2) the defendant had "no reason to know" that the property was contaminated; (3) the defendant took "all appropriate inquiry[14] into the previous ownership and uses

---

14. In order to determine whether a defendant conducted "all appropriate inquiry," a court must consider: (1) any specialized knowledge or experience on the part of the defendant; (2) the relationship of the purchase price to the value of the property if uncontaminated; (3) commonly known or reasonably ascertainable information about the property; (4) the obviousness of the presence or likely presence of contamination at the property; and (5) the ability to detect such contamination by appropriate inspection. 42 U.S.C. § 9601(35)(B).

of the property consistent with good commercial or customary practice" in an effort to minimize liability; and (4) once the contamination was discovered, the defendant exercised due care with respect to the hazardous substances concerned. *See* 42 U.S.C. § 9607(b)(3); 42 U.S.C. § 9601(35)(A)-(B).

■ Subsequent to the initiation of this lawsuit, Congress enacted the Small Business Relief and Brownfields Revitalization Act (the "Act" or "Brownfields Amendments"), which altered elements of CERCLA's innocent landowner defense. *See* Pub.L. No. 107–118, 115 Stat. 2356 (2001). In part, this Act was intended to encourage the purchase and development of "brownfields" [15] by attempting to eliminate the fear of CERCLA liability often associated with the purchase of such land. *See* S.Rep. No. 107–2, at 2 (2001). The Act altered CERCLA's innocent landowner defense in three significant ways. First, the Act changed the "all appropriate inquiries" standard from one that must be "consistent with good commercial or customary practice" to one that must be "in accordance with generally accepted good commercial and customary standards and practices." 42 U.S.C. § 9601(35)(B)(i)(I). Second, it established criteria for determining whether a defendant has made "all appropriate inquiries" regarding the past ownership and usage of a property.[16] Third, a party must now demonstrate to the court that it took reasonable steps to stop any continuing release, prevent any

future release, and prevent or limit exposure to any previously released hazardous substance. 42 U.S.C. § 9601(35)(B)(i)(II)(aa)-(cc). The Act and its legislative history are silent on the question of retroactivity. The Government contends that the Act's amendments to the innocent landowner defense should apply in this case even though this matter was already in litigation at the time of passage. Lombardi Realty, however, argues that the version of the innocent landowner defense in effect at the time the underlying facts in this case occurred should control. While perhaps not outcome determinative, this Court must answer this question in order to determine the applicable legal standard to apply to the facts of this case.

■ In *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1522, 128 L.Ed.2d 229 (1994), the United States Supreme Court recognized the traditional presumption against retroactive application because "considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf*, 511 U.S. at 265, 114 S.Ct. 1483. The Court set forth a two-part analysis for determining when a court should apply newly enacted legislation to a pending case.

When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress

---

**15.** A brownfield site means "real property, the expansion, redevelopment, or reuse of which may be complicated by the presence or potential presence of a hazardous substance, pollutant, or contaminant." 42 U.S.C. § 9601(39)(A).

**16.** The statute charged the EPA with the obligation to establish standards and practices for the purpose of satisfying the "all appropriate inquiries" requirement within two years of

the Act's enactment. *See* 42 U.S.C. § 9601(35)(B)(ii). The Act also established interim standards that courts are to apply until the EPA adopts its regulations. For property purchased before May 31, 1997, those standards and practices are identical to the standards employed by the innocent landowner defense prior to the Act's enactment. *See* 42 U.S.C. § 9601(35)(B)(iv).

has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Id.* at 280, 114 S.Ct. 1483. Under this framework, the initial question for the Court is whether Congress has expressly prescribed the statute's temporal reach. *See Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483. Here, the Act provides no explicit statutory command regarding retroactive application of its amendments to the innocent landowner defense.[17] Accordingly, this Court must determine whether application of the Brownfields Amendments to this case "would have retroactive effect." *Id.*

The Government contends that the differences between the two versions of the innocent landowner defense have no practical effect as applied in this case. This Court disagrees. While the Brownfields Amendments did make some rather minor changes to the innocent landowner defense, the Act also created additional, substantive requirements. Under the Brownfields Amendments, a defendant must also show that it "provide[d] full cooperation, assistance, and facility access to the persons that are authorized to conduct re-

sponse actions at the facility." 42 U.S.C. § 9601(35)(A). The defendant also must show that it complied with all institutional controls and land use restrictions at the facility. *See id.* Additionally, a defendant must prove that it "took reasonable steps to stop any continuing release; prevent any threatened future release; and prevent or limit any human, environmental, or natural resource exposure to any previously released hazardous substance." 42 U.S.C. § 9601(35)(B)(i)(II). All of these requirements are in addition to the requirements that existed under the pre-Brownfields Amendments version of the innocent landowner defense. Accordingly, this Court finds that if the Brownfields Amendments to the innocent landowner defense were applied to this case, it would have retroactive effect by imposing new substantive obligations on Lombardi Realty years after RIDEM and the EPA's investigation into contamination at the Site began. Because of this retroactive impact and the lack of clear congressional intent favoring such a result, this Court concludes that the innocent landowner defense, as it existed at the time the underlying events in this case occurred, is the appropriate standard to be applied in this case.

C.  Application of the Innocent Landowner Defense

█  In order to take advantage of the innocent landowner defense, Lombardi Realty must first meet the threshold burden of proving that the contamination at the Site was caused "*solely* by an act or omission of a third party." 42 U.S.C.

---

17. The Government contends that Congress' intent for the Brownfields Amendments to apply retroactively is evidenced by the inclusion of standards that shall apply to property purchased prior to May 31, 1997. This fact does not answer the question, however. Con-

gress did not specify whether those standards apply to cases pending at the time of enactment, or whether those standards apply to property purchased prior to May 31, 1997, but not the subject of an EPA enforcement action until after the date of enactment.

§ 9607(b)(3) (emphasis added). Accordingly, Lombardi Realty cannot avail itself of the protection of the innocent landowner defense if it contributed to the release of PCBs at the Site. *See Carson Harbor Village, Ltd. v. Unocal Corp.,* 270 F.3d 863, 887 (9th Cir.2001); *United States v. 150 Acres of Land,* 204 F.3d 698, 704–05 (6th Cir.2000) (holding that proof as to whether a third party was the sole cause of a release is a dispositive issue for purposes of the innocent landowner defense); *Cal. Dept. of Toxic Services v. Neville Chemical Co.,* 213 F.Supp.2d 1115, 1125 (C.D.Cal. 2002) (holding that the defense is unavailable to anyone who contributed, actively or passively, to the release of a hazardous substance at a site); *City of New York v. Exxon Corp.,* 766 F.Supp. 177, 195 (S.D.N.Y.1991).

While Lombardi Realty attempted to establish that Allen had disposed of transformers on the property through the testimony of Plympton and Lombardi, that testimony was rife with credibility problems for the reasons outlined above. While there is evidence to indicate that Allen operated a junk or scrap yard, there is none to establish that he contaminated the Site with PCBs. The Government, on the other hand, offered testimony from numerous credible witnesses regarding the presence of transformers on the Site during Lombardi Realty's ownership. First, Haroldean Allen testified that she never saw her husband dispose of transformers at the Robin Hollow Road property. Second, Lambert testified that she witnessed Lombardi with transformers on the property on several different occasions. *See* Tr. Tr. IV 81:14–82:25; 83:18–84:6. Third, Broadhurst also testified that she saw broken transformers "with some kind of oil stuff" and "oil around" them. Tr. Tr. IV 38:7–39:14. Accordingly, Lombardi Realty has not proven that the PCB contamination was caused solely by Allen

or any other third party. Therefore, this Court holds that Lombardi Realty cannot avail itself of the protections of the innocent landowner defense.

■ Even if Lombardi Realty could establish that the release was caused solely by the act or omission of a third party, it would still be unable to prove the other elements of the innocent landowner defense. Lombardi Realty failed to offer sufficient evidence that it "had no reason to know" of the presence of PCBs on the Site. While the Defendant presented no evidence as to what constituted "good commercial or customary practices" for purchasing property in Rhode Island in 1986, the Government proffered expert testimony indicating that an environmental assessment of the property would have been required. Lombardi Realty never performed an environmental assessment of the Site, nor does this Court find that the Defendant made any other meaningful inquiry into the Site's environmental state. Accordingly, Lombardi Realty cannot prove that it carried out all appropriate inquiry into the prior use of the property as required by 42 U.S.C. § 9601(35)(B).

■ Lombardi Realty also failed to meet its burden of establishing that it took "due care" with respect to the PCB contaminated soil. As early as 1989, RIDEM issued an NOV ordering Lombardi Realty to, *inter alia,* inform all visitors to the property of the soil contamination and its hazards. At trial, the Government submitted unrebutted testimony from Prest, Broadhurst, and Sustarsic, which established that the Defendant never informed visitors or tenants living on the property of the contamination. Furthermore, the Government established that Lombardi Realty never properly stored the contaminated soil following its removal. On numerous occasions, witnesses observed the piles of

soil in an uncovered state. Lombardi Realty also failed to obtain a "roll-off" container to store the contaminated soil despite the EPA's orders. Lombardi Realty is therefore unable to prove that it acted with due care in regard to the contaminated soil.

### D. The Type and Amount of Response Costs Eligible for Recovery

Despite having submitted over 400 stipulations in this case, the parties have still found a way to fight over just about everything. Their treatment of the type and amount of response costs eligible for recovery is no different.

The parties stipulated that the United States incurred $481,068.51 in response costs, exclusive of interest, in connection with the removal action at the Robin Hollow Road Site through September 30, 2002. *See* Joint Stips. at ¶ 387. The parties were also able to stipulate that the response costs consist of the following: (1) EPA Regional Payroll costs, $28,945.83; (2) EPA Indirect costs, $89,702.55; (3) EPA Regional Travel costs, $312.30; (4) Emergency Removal Cleanup Services Contract costs, $250,840.65; (5) Interagency Agreement with the Department of Justice costs, $89,989.99; (6) Superfund Technical Assistance and Response Team Contract costs, $5,553.05; and (7) Technical Assistance Team Contract costs, $15,724.14. *See id.* The parties also stipulated that the United States incurred an additional $98,404.46 in response costs, excluding interest, between September 30, 2002, and March 1, 2003. *See* Joint Stips. at ¶ 388. Despite these stipulations as to the amount of the Government's response costs, Lombardi Realty contends that: (1) the amount of direct response costs incurred by the Government were not in accordance with the National Contingency Plan ("NCP"); (2) the amount of indirect

response costs that the Government attempts to collect is excessive; and (3) the Government's interest calculations are based on an inaccurate methodology.

■ *Direct Response Costs:* CERCLA specifically allows the Government to bring suit to recover "all costs of removal ... incurred by the United States Government ... not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A); *United States v. Dico, Inc.,* 266 F.3d 864, 876 (8th Cir.2001). Courts have uniformly held that the costs recoverable from an enforcement action include indirect and oversight costs associated with the removal. *See United States v. Ottati & Goss, Inc.,* 900 F.2d 429, 444 (1st Cir.1990); *United States v. Chromalloy Am. Corp.,* 158 F.3d 345, 351–52 (5th Cir.1998); *United States v. Am. Cyanamid Co.,* 786 F.Supp. 152, 157 (D.R.I.1992).

■ Once the government has established the amount of its response costs, a defendant may only avoid recovery of those costs if it can prove that the costs were incurred in a manner inconsistent with the NCP. *See United States v. Hardage,* 982 F.2d 1436, 1442 (10th Cir.1992). In order to prove that costs were not incurred in a manner consistent with the NCP, a defendant must prove that the government's "choice of response action was arbitrary and capricious." *Id.* at 1443.

Lombardi Realty contends that the removal of 900 tons of soil, in addition to the 70 tons of contaminated soil removed by the Defendant, was arbitrary and capricious. Specifically, the Defendant contends that the EPA utilized a faulty methodology for determining an appropriate level of PCBs that could remain in the soil at the Site. As a result, the Defendant contends that the EPA excavated 900 additional tons of soil when only 185 additional tons needed to be excavated in order to bring the PCBs to an acceptable level.

However, as the Government correctly points out, Lombardi Realty provided no evidence, expert or otherwise, that would indicate that the EPA conducted the removal of soil at the Site in an arbitrary and capricious manner. The Government, on the other hand, provided substantial testimony from Lipson in support of the EPA's reasons for conducting the removal action in this manner. *See* Tr. Tr. II 138:12–176:10. This Court is in no position to question the EPA's decision to remove the additional amount of soil absent any evidence to indicate that less radical action would have been adequate and appropriate. Accordingly, the United States is entitled to recover the entire amount of its direct response costs.

■ *Indirect Response Costs:* Lombardi Realty also contests some of the indirect costs that the Government attempts to collect in this case. Specifically, the Defendant claims that the Government should not be allowed to claim costs attributable to outside vendors as indirect costs. In this case, indirect costs attributable to outside vendors include payments made to the DOJ for attorneys fees, as well as payments made to OHM Remediation Services Corporation and Roy F. Weston, Inc., both companies that assisted the Government in the removal of the contaminated soil.

In support of this argument, the Defendant cites to *United States v. Ottati & Goss, Inc.,* 900 F.2d 429 (1st Cir.1990) for the proposition that the only recoverable indirect costs are those attributable to EPA's payroll costs. In *Ottati & Goss,* the First Circuit held that indirect costs encompass "administrative overhead, i.e., a proportionate share of rent, utilities, administrative staff costs, etc., that are not readily allocable to one specific, rather than some other specific, cleanup site." 900 F.2d at 444; *United States v. Norther-*

*naire Plating Co.,* 685 F.Supp. 1410, 1419–20 (W.D.Mich.1988). The *Ottati & Goss* court did not indicate whether payments to outside vendors could be included in an indirect cost calculation.

The EPA's treatment of attorneys fees as payments made to an outside vendor should not prevent the Government from collecting indirect costs in this case. Courts have routinely held that attorneys fees are recoverable costs under CERCLA. *See, e.g., Dico,* 266 F.3d at 879; *United States v. Hardage,* 750 F.Supp. 1460, 1501 (W.D.Okl.1990); *United States v. South Carolina Recycling and Disposal, Inc.,* 653 F.Supp. 984, 1009 (D.S.C.1984) (holding that the United States can recover litigation expenses, including attorneys fees) *aff'd in part and vacated in part sub nom. United States v. Monsanto Co.,* 858 F.2d 160 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). This Court will not deny the EPA's entitlement to attorneys fees simply because government accountants chose to itemize the fees as if they had been made to an outside vendor. Consequently, the Government shall submit an itemized account of attorneys fees for which it seeks reimbursement so that the Court can make a determination as to their reasonableness.

■ With respect to the other "outside vendors," Lombardi Realty bears the burden of proving that any indirect costs attributable to these vendors are inconsistent with the NCP. *See Dico,* 266 F.3d at 879 (holding that CERCLA defendants bear the burden of proving that the government's requested recovery costs are inconsistent with the NCP); *Chromalloy,* 158 F.3d at 352 n. 3 ("The burden of proving inconsistency with the NCP rests with the responsible party."). While Lombardi Realty offered no evidence to counter the EPA's accounting methodology, the Government provided the testimony of

Charles Young ("Young"), the Chief of the EPA's Program and Cost Accounting Branch, as support for the EPA's method of accounting for its payments to outside vendors as indirect costs. *See* Tr. Tr. IV 166:3–168:5. In light of this unrebutted expert testimony, this Court finds that the Defendant has not met its burden of proving that payments to outside vendors are inconsistent with the NCP. Accordingly, this Court finds that the Government is entitled to recover $89,702.55 in indirect costs.

■ *Interest:* Pursuant to 42 U.S.C. § 9607(a), the Government is also entitled to prejudgment interest on response costs recoverable in this action. CERCLA provides that "interest shall accrue from the later of (i) the date of payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned." 42 U.S.C. § 9607(a)(4). The interest accrues on an unpaid balance of the amounts recoverable according to the Hazardous Substance Superfund established by 26 U.S.C. § 9507. *See* Joint Stips. at ¶ 393. Congress permitted the collection of interest in these cases to ensure "that when the government is forced to expend Superfund money on clean-up actions, Superfund will be fully replenished." *United States v. Am. Cyanamid Co.,* 786 F.Supp. 152, 164 (D.R.I.1992).

On April 3, 1998, the United States made a written demand on Lombardi Realty for payment in the amount of $327,992.12. *See* Gov't. Ex. 140. Lombardi Realty contends that the Government may only collect prejudgment interest on the outstanding unpaid balance, and not on any unpaid interest. In other words, Lombardi Realty contends that the Government is not entitled to compound interest on the unpaid recovery costs. This Court disagrees. Lombardi Realty is responsible for the amounts spent to clean- up the Site and for the lost investment income those amounts would have earned if they had remained in the Superfund coffer. *See Am. Cyanamid Co.,* 786 F.Supp. at 164 (holding that the United States is entitled to compound prejudgment interest on the amount recovered in a cost recovery action). Accordingly, the Government is entitled to recoup prejudgment interest on unpaid recovery costs and unpaid interest pursuant to 26 U.S.C. § 9507. The Government shall submit revised interest calculations based on the final determinations of costs awarded by this Court.

III. *Conclusion*

For the foregoing reasons, it is hereby ordered that judgment shall enter against Defendant and in favor of the Plaintiff in the amount of $579,472.97, plus prejudgment interest, provided that this Court determines the request for attorneys fees to be reasonable. The Court further orders that the Defendant shall be liable for recovery costs that accrued after September 30, 2002, through the date of decision in this case. The United States shall submit prejudgment interest calculations and an itemized account of attorneys fees sought in this case within 30 days of the date of this decision. This Order shall not become final, and judgment shall not enter, until all issues involved in this litigation are fully resolved.

IT IS SO ORDERED,